Commonwealth, Appellant, *v.* Blatstein, Appel-lant.

Submitted June 18, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

peti-tion for reargument refused January 10, 1975.

*David Richman, James T. Ranney,* and *Steven H. Goldblatt,* Assistant District Attorneys, *Abraham J. Gafni,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *F. Emmett Fitzpatrick,* District Attorney, for Commonwealth, appellant, at No. 1430.

*Joseph A. C. Girone* and *Alfred P. Filippone,* for appellant, at No. 1843.

*Joseph A. C. Girone* and *Alfred P. Filippone,* for appellee, at No. 1430.

*David Richman, James T. Ranney,* and *Steven H. Goldblatt,* Assistant District Attorneys, *Abraham*

*J. Gafni,* Deputy District Attorney, *Richard A. Sprague,* First Assistant District Attorney, and *F. Emmett Fitzpatrick,* District Attorney, for Commonwealth, appellee, at No. 1843.

OPINION BY CERCONE, J., December 11, 1974:

On October 30, 1969, a Philadelphia County Grand Jury returned four true bills of indictment charging appellant, Harry Blatstein, under the Penal Code of 1939, with bribery of governmental officials and employees,[1] bribery of governmental servants and employees,[2] extortion,[3] and malfeasance, misfeasance and nonfeasance in office.[4] Following a long and complex procedural battle, the matter finally came to trial on April 4, 1972.[5] On April 11, 1972, the jury returned

[1] Act of June 24, 1939, P. L. 872, §303, as amended July 31, 1963, P. L. 421, §1, 18 P.S. §4303 (App. 1973).

[2] Act of June 24, 1939, P. L. 872, §667, 18 P.S. §4667 (App. 1973).

[3] Common law offense.

[4] Common law offense.

[5] The prolonged delay between October, 1969, when the indictments were returned, and trial was occasioned by the pretrial litigation which ultimately went to the United States Supreme Court. This defendant, as well as others indicted as a result of the investigating grand jury's recommendations, challenged by way of pre-trial motion certain procedures that had been routinely followed by the investigating grand jury. This motion was argued before the Honorable Edmund B. SPAETH, JR., then on the Common Pleas Court, who by opinion dated July 27, 1970, quashed the indictments of this defendant as well as the others.

Then followed better than two years of appellate litigation, the result being that the indictments in this particular case were fully reinstated. Initially, the Commonwealth appealed Judge SPAETH's decision to the Pennsylvania Superior Court which affirmed the decision by an equally divided court without opinion. *Commonwealth v. Blatstein,* 217 Pa. Superior Ct. 788 (1970). The Commonwealth next petitioned the Supreme Court for allocatur which was granted and the case was set down for argument. Following extensive argument, the Court reinstated the indictments

a verdict of guilty on each of the four bills of indictment. The appellant filed timely motions for a new trial and in arrest of judgment, whereupon the court en banc heard oral argument. The court en banc denied defendant's motions regarding the charges of bribery of servants and employees (Indictment No. 2678), and malfeasance, misfeasance, nonfeasance (Indictment No. 2680). However, it granted defendant's motions in arrest of judgment on the charges of bribery of governmental officers and employees (Indictment No. 2677), and extortion (Indictment No. 2679). On Indictments Nos. 2678 and 2680 the court imposed a sentence of one year probation and a fine of $500.00. Both the defendant and the Commonwealth have appealed from those orders, except that the Commonwealth does not now contest the court's ruling on the charge of bribery of governmental officers and employees.

## FACTUAL BACKGROUND

To expedite the planning and construction of Philadelphia's new sports stadium (now Veterans' Stadium), a "stadium committee" was created to develop general operating policies, design the stadium, receive and review all major bids, and award construction contracts. The position of "stadium coordinator" was also created; and, as conceived, the person holding that position was to be the "executive director" for the stadium committee. Harry Blatstein was the first person to hold that position. As such he was a "liai-

against Blatstein. *Commonwealth v. McCloskey*, 443 Pa. 117 (1971). Certain defendants then petitioned the United States Supreme Court for certiorari. This petition, as well as a Commonwealth petition for certiorari, was denied. See *Steinberg v. Pennsylvania*, 10 Cr. L. 4102 (December 22, 1971); *McCloskey v. Pennsylvania*, 10 Cr. L. 4102 (December 22, 1971); *Pennsylvania v. McCloskey*, 10 Cr. L. 4102 (December 22, 1971).

son" between the contractors and the stadium committee, forwarding reports and recommendations to the Committee for its action, and providing information to prospective bidders as to the nature of the work required, and so forth. His relationship with the committee was advisory, however, and he had no vote in the ultimate determination of contract awards.

In this capacity he was in contact with the two principal bidders on the contract for installing the seats in the stadium, American Seating Company of Grand Rapids, Michigan ("Seating") and the American Desk Company of Temple, Texas ("Desk"). Both "Seating" and "Desk" submitted bids in accordance with the specifications drawn up by the Committee. While both bids were in excess of 1.4 million dollars, Desk had underbid Seating by approximately $65,000. This revelation left the stadium committee with only two choices under Section 8-200(2)(b) of the Philadelphia Home Rule Charter: it could accept Desk's bid on the contract; or, if it were in the city's best interests to do so, it could reject all bids and declare the bidding reopened.

The basis of the charges against Mr. Blatstein was a conversation which took place roughly one month after the seating-contract bids were opened in August of 1968. The principals in that conversation were Blatstein and one John Sherry, then sales manager for "Seating," the company which had submitted the higher bid. The substance of that discussion, which was one of many between Sherry and Blatstein as part of Sherry's intense efforts to secure the lucrative contract for his company, was provided at the trial by Mr. Sherry: "Q. Now during the period from August 19, 1968, until October or any time thereafter, really, did anyone at any time mention the payment of any money to you in connection with getting the seating contract? A. Yes. Q. And who was that? A. Mr. Blat-

stein. Q. And when was that conversation, if you recall? A. I can only guess. I would think it would be around early September, to the best of my recollection. Q. This is September of 1968? A. Right. Q. And where were you and Mr. Blatstein at the time the conversation took place? A. I went down to see Mr. Blatstein at the Municipal Building in City Hall. He was busy and he said he had some work to do or something to do in the Spectrum. The Spectrum, I think, was in receivership at that time. He asked if I'd mind taking a ride down with him, and we went down to the Spectrum. He said it would only be a few minutes. We went down, and he handled his business, whatever it may be, and we rode back. And I can't recall the exact conversation, but, naturally, I was asking how it looked or if there was a possibility. And he said that the only possibility would be to have this rejected and rebid, and they were studying that, but that it would probably cost me or the company $10,-000, something to that effect. What the exact conversation is, I don't know. Q. Well, what, if anything, did he say about the $10,000, why you would have to pay $10,000? MR. FILIPPONE: I object to the leading question. THE COURT: Sustained: BY MR. MAKADON: Q. What, if anything, did he say about the $10,000? A. Just that it would cost $10,000 should they be able to get us the contract. It was very vague, and the way whether it was he or the party or what I really couldn't say. Q. When you say it was very vague as to whether he or the party— A. He just said it would cost $10,000. Q. And did you know to whom you were to pay that $10,000? A. No, sir. Q. And when you said before he was vague as to he or the party, do you mean that you did not know whether you'd have to pay the $10,000 to him or to the political party? A. That's correct. Q. And I take it that there was never a time that you got the contract? A. No, sir."

## Sufficiency of the Evidence

With this general background in mind, we may proceed to appellant's first allegations of error—the insufficiency of the evidence to sustain the verdicts of guilty on the charges of bribery of government servants and employees and malfeasance, misfeasance and nonfeasance in office. On an appeal challenging the sufficiency of the evidence, the reviewing court must view the evidence, and all reasonable inferences that can be drawn therefrom, in the light most favorable to the verdict winner, "accepting as true all the evidence upon which, if believed, the jury may properly have based its verdict. *Commonwealth v. Burns*, 409 Pa. 619 (1963).

A. The Pennsylvania Bribery of Servants and Employees statute under the Penal Code[6] provided, in pertinent part: "[W]hoever being an agent, employe, or servant, solicits, accepts, receives or takes, directly or indirectly, any commission, money, property, or other valuable thing as an inducement, bribe or reward for doing or omitting to do any act, or for showing any favor or disfavor in relation to the affairs or business of his principal, employer, or master, is guilty of a misdemeanor. . . ."

In his argument in the instant appeal, appellant relies chiefly upon two decisions of our Supreme Court: *Commonwealth v. Yobbagy*, 410 Pa. 172 (1963) and *Commonwealth v. Bausewine*, 354 Pa. 35 (1946), both of which espoused the principle that guilt must be proved and not conjectured. In neither of these cases, however, was there a shred of credible evidence either directly or circumstantially proving the defendants' guilt of the crimes charged. In *Yobbagy*, the appellant was convicted of conspiracy to commit extortion although there was no evidence of an agree-

---

[6] *Supra*, note 1.

ment between his co-defendant and him. The only incriminating evidence against Yobbagy was his statement to the victims that his co-defendant "could be talked to." The Commonwealth admitted that he took no part in the discussions or payments which ensued. In reversing the judgment of sentence the Supreme Court stated, through Justice MUSMANNO, that there was not "a scintilla of evidence of any such understanding between Yobbagy and [his co-defendant]." In *Bausewine*, there was no doubt that the testimony of the Commonwealth's witnesses was sufficient to convict the appellant of bribery and nonfeasance, *if it was credible.* In reversing the guilty verdict, however, the Supreme Court determined that in the face of the unimpeachable evidence offered by the defendant, and the inherently dubious evidence offered by the Commonwealth, no reasonable jury could have concluded beyond a reasonable doubt that appellant therein had committed the crime charged.[7]

Based upon *Yobbagy* and *Bausewine*, appellant argues that his guilty verdict cannot be sustained because Sherry's testimony was vague and raised merely a suspicion of guilty intention. Unlike *Yobbagy*, where solicitation of a bribe was not charged, it was unnecessary to show conspiracy in the instant case. Furthermore, Sherry's testimony "that it would cost $10,000 *should they be able to get us the contract,*" linked the $10,000 payment to Blatstein's intended efforts on

[7] Mr. Bausewine was a seventy-seven year old police chief who had served as a police officer beyond reproach for decades. Several respected members of the community testified that they had been with appellant at the time the payment was allegedly made at a place nowhere near the alleged situs of the bribe. Furthermore, the Commonwealth's witnesses had a "grudge" against appellant and were, therefore, motivated to lie. Finally, the police officers who worked under Bausewine testified that they were never told to provide the "protection" to the illegal gambling operation which the alleged bribe was intended to secure.

Sherry's company's behalf. Finally, when Blatstein took the stand he denied that he had ever mentioned $10,000 in any context. Thus, when the jury determined that Sherry was telling the truth about the $10,000, they necessarily determined that Blatstein was lying when he denied having ever mentioned the $10,000. Since Blatstein was unwilling to admit to the statement to Sherry about the $10,000, the jury could reasonably infer that he mentioned the money with a guilty mind or intention, thus fortifying an incriminating interpretation of Sherry's testimony.[8] *Commonwealth v. Lettrich*, 346 Pa. 497 (1943). Accordingly, the jury reasonably concluded that the defendant did, in fact, solicit $10,000 as a fee for reopening the bidding on the stadium seating contract so that "Seating" would be awarded the contract.

B. The Commonwealth's case concerning the malfeasance, misfeasance or nonfeasance (misconduct) charge was not so strong. As the assistant district attorney stated to the court in arguing against appellant's various motions for directed verdicts: "As to misfeasance, malfeasance and nonfeasance in office, I don't think that the Commonwealth proved that Mr. Blatstein by virtue of his acts delayed the stadium. I know that our failure to prove that could cause the indictment to not go to the jury at this point." Of course, the Commonwealth need not show that Blatstein's conduct in fact delayed the construction of the stadium, but only that his efforts were calculated to do so for an improper purpose. The Commonwealth, however, offered no evidence to show that Blatstein attempted to delay the approval of the

---

[8] While Sherry's credibility was impeachable because he admitted to being angry about losing the contract, it was not nearly so weak as the Commonwealth witnesses' in *Bausewine*. Nor did Blatstein offer strong evidence in his defense as was produced in *Bausewine*.

seating contract after his conversation with Sherry. The delays were shown to have been caused by the activities of Sherry and the United Auto Workers, both of whom wanted the contract awarded to Sherry's company. (Seating was a union shop employing member of the UAW, while Desk was a non-union shop. Hence, Sherry and the UAW both contended that since Philadelphia was a "pro-union city," it was not in the city's best interests to award contracts to non-union employers.) On appeal the Commonwealth only argues that in proving the violation of the Bribery of Governmental Servants and Employees statute, they necessarily proved misconduct in office. We disagree.

In order to show misconduct in office, it is not sufficient to show that Blatstein solicited or even accepted a bribe. The Commonwealth must demonstrate that Blatstein followed the course of conduct which the bribe sought to secure. As Professor Perkins has said: "The corrupt *receipt* of a bribe by an officer, for example, is criminal misconduct of one *while* in office, but such a *recipient* is clearly not acting in the exercise of the duties of his office, nor is this wrongful act under color of his office, and bribery has always been recognized as a separate offense. In fact, if an officer corruptly *receives* a bribe and then corruptly *does* what he has been bribed to do, he is guilty of both bribery and misconduct in office." (Emphasis added.) R. Perkins, Criminal Law 482 (1969). Since proof of solicitation of a bribe does not necessarily entail proof of misconduct in office, the Commonwealth had to show that Blatstein acted upon his offer to Sherry in advising the committee. In failing to do so, which the Commonwealth virtually admitted at trial, it failed to prove that Blatstein was guilty of misconduct in office. The Commonwealth having failed in its proof of this necessary, additional element, the lower court erred when it dismissed appel-

lant's motion in arrest of judgment on the indictment charging malfeasance, misfeasance and nonfeasance in office.

### CROSS-EXAMINATION OF CHARACTER WITNESSES

The second major question presented here is also raised by the defendant Blatstein. At the conclusion of the Commonwealth's case, defendant's attorney requested the trial judge to rule whether the Commonwealth would be permitted to test the credibility of defendant's character witnesses—should such character witnesses be called—by cross-examining them as to their knowledge of other arrests of the defendant.[9] The trial judge ruled that the Commonwealth would be permitted to so cross-examine defendant's character witnesses if the form of the questions were proper. The trial judge further stated that following any such questioning he would give appropriate limiting instructions to the jury. Apparently dissatisfied with this ruling, defendant's attorney chose not to call any character witnesses, and now maintains that this ruling prejudiced appellant by depriving him of his right to have the jury hear testimony of his reputation for good character and honesty. Unfortunately we do not know what questions would have been asked on cross-examination of defendant's character witnesses, for as a matter of trial strategy, defendant's attorney declined to call any. The trial court may have excluded the questions concerning subsequent arrests on other grounds such as their prejudice outweighing their relevance. In any event, had counsel called the character witnesses, and had the court allowed improper cross-examination, appellant would have been entitled to a new trial. We are therefore not

___

[9] Defendant had been arrested for other unrelated offenses subsequent to his arrest on the charges for which he was tried in the instant case.

disposed to resolve this question in the abstract as appellant asked the lower court to do. Any other decision would be conjectural on our part.

## PROSECUTOR'S CLOSING REMARKS

Blatstein's third contention has to do with certain alleged improper and prejudicial characterizations of the defendant made by the District Attorney in his closing remarks to the jury. Specifically, the prosecutor referred to the defendant as a "liar" and a "crook." While defense counsel objected from time to time to certain aspects of the prosecutor's closing, at no time did the defense object generally or move for a mistrial based on those remarks. Having failed to do so at trial, appellant now argues that the prosecutor's remarks were so inflammatory and prejudicial that they required the trial judge to declare a mistrial *sua sponte*.

It is true that "the prosecuting attorney enjoys an office of unusual responsibility, and that his trial conduct should never be vindictive or attempt in any manner to influence the jury by arousing their prejudices." *Commonwealth v. Toney*, 439 Pa. 173, 180 (1970). Remarks such as those made by the prosecution might violate the ABA Standards Relating to the Prosecution function, which state: "It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence . . . of the defendant." ABA Project on Standards for Criminal Justice, Standards Relating to the Prosecution and Defense Function §5.8(b). (Prosecution Function.) As pointed out in *Commonwealth v. Revty*, 448 Pa. 512, 517 (1972): "While a prosecutor, in order to present the Commonwealth's case in the most favorable light, may make *fair* deductions and suggest to the jury *appropriate* inferences *from the evidence*, a society cannot permit its agent to attempt to prejudice the minds of the

jury against the accused by making wholly unsupported inferences that the accused deliberately deceived the jury."

It therefore might have been proper for the trial judge to have granted a mistrial, if the prosecutor's remarks were unfounded and prejudicial, *had defense counsel made such a motion at the time.* However, as we have stated, no general objection was made to the District Attorney's closing and no motion for mistrial was made by the defendant.[10]

Generally, objections not made at trial may not be urged on appeal. *Commonwealth v. Raymond,* 412 Pa. 194 (1963). "A party may not remain silent and take chances on a verdict and afterwards complain of matters which, if erroneous, the Court would have corrected." *Commonwealth v. Marlin,* 452 Pa. 380, 382 (1973). Additionally, Pa. R. Crim. P. 1118 requires that a motion to declare a mistrial, based on a prejudicial event that has occurred at the trial, be made only by the defendant or his attorney. In *Commonwealth v. Lauria,* 450 Pa. 72, 75 (1972), the Court declared that it was improper for the trial judge to declare a mistrial *sua sponte*: "The language of the rule is clear, and its obvious intendment is, inter alia, to remove from trial judges the power to declare mistrials sua sponte." For these reasons we cannot subscribe to the appellant's contention that the District Attorney's remarks require a new trial.

### MOLDING THE VERDICT

Lastly, the Commonwealth appeals from the lower court's grant of defendant's motion in arrest of judgment on the jury's finding that defendant was guilty of

---

[10] We express no opinion as to whether it would have been improper for the trial judge to deny such a motion had it been made. Furthermore, no argument is made in this appeal that defendant did not have effective assistance of counsel.

extortion. The Commonwealth's indictment, charging defendant with "Extortion" read: "That on or about September 1, 1968, in Philadelphia County, Harry Blatstein . . . did willfully and fraudulently solicit the payment of and *attempt* to extort money from the American Seating Company. . . ." (Emphasis added.)

The trial judge, in his charge to the jury, emphasized that the defendant was charged merely with attempted extortion and not with the completed offense. Furthermore, the proof at trial showed that no money was ever received by Blatstein; therefore, conviction on the completed offense was not sought by the Commonwealth. Nevertheless, the jury found defendant guilty of extortion.[11] The jury was then discharged.

The defect in this verdict might have been corrected by molding had such action been requested before the verdict was recorded and the jury excused. No such request or suggestion was made, however. Therefore we are bound by *Commonwealth v. Dzvonick*, 450 Pa. 98 (1972) to affirm the arrest of judgment.

In *Dzvonick*, 450 Pa. at 103, the Court noted that: "After the verdict has been recorded and the jury discharged, only in 'extremely exceptional cases' may the verdict be molded and even then 'only unless to make the corrected verdict conform to the obvious intention of the jury, i.e., to conform to a verdict *actually rendered*, but informally or improperly stated in writing.'" (Emphasis added.) In *Dzvonick*, the jury had found the defendant guilty of the completed offense of assault with intent to maim even though it was conceded by all parties that the completed offense had not been proved. The Commonwealth argued that the verdict be molded to find defendant guilty of an attempt to assault with

---

[11] It appears from the record that the Bill of Indictment while charging Blatstein with "attempted extortion" in its body was labelled simply "Charges: Extortion."

intent to maim. This our Supreme Court refused to do even though, "examination of the entire record reveals that the indictment returned against the appellant actually charged him with *attempted* assault with intent to maim. Furthermore, the evidence presented at the trial, the judge's initial charge to the jury, and a supplemental charge given during the course of the jury's deliberation all show that the appellant was tried for the crime of attempted assault with intent to maim. In short, with the exception of the verdict slip, every reference to the crime committed by the appellant refers to an attempt rather than a completed offense." (dissenting opinion of Mr. Chief Justice JONES, at p. 109.) Once the jury has been discharged and has dispersed it is too late for the trial judge to mold the verdict. *Commonwealth v. Dzvonick,* supra.

For the above reasons, the decision of the lower court granting defendant's motions in arrest of judgment on charges of bribery of governmental officers and employees, and of extortion is affirmed. The order denying defendant's motion in arrest of judgment on the charge of malfeasance, misfeasance and nonfeasance in office is reversed, and the case is remanded for resentencing on the charge of bribery of servant and employees, in accordance with this opinion.

It is so ordered.

JACOBS, J., concurs in the result.

SPAETH, J., did not participate in the consideration or decision of this case.