v.

FRATERNAL ORDER OF POLICE,
FORT PITT LODGE NO. 1,
Petitioner.

Supreme Court of Pennsylvania.

Nov. 30, 2005.

COMMONWEALTH of Pennsylvania,
Appellant,

v.

Audrey McDANIELS, Appellee.

Superior Court of Pennsylvania.

Argued June 14, 2005.

Filed Oct. 13, 2005.

Reargument Denied Dec. 13, 2005.

Hugh J. Burns, Jr., Asst. Dist. Atty., and Max Kaufman, Asst. Dist. Atty., Philadelphia, for Com., appellant.

Samuel C. Stretton, W. Chester, for appellee.

BEFORE: MUSMANNO, MONTEMURO * and KELLY, JJ.

OPINION BY MONTEMURO, J.:

¶ 1 In this highly unusual Commonwealth appeal, we are asked to determine

* Retired Justice assigned to Superior Court.

the validity of a jury verdict of not guilty as to a charge of third degree murder, when the jury had originally declared that it was unable to reach a verdict on both the third degree murder charge and an additional involuntary manslaughter charge, the original verdict had been recorded, and the jury discharged. Because we find that the court's dismissal of the jury's original verdict was improper, we reverse and remand for reinstatement of the charge of third degree murder.

¶ 2 In October of 2002, Appellee was arrested in connection with the death of her stepson, Brahim Dukes. Following an autopsy, Dukes' death was ruled a homicide by starvation and dehydration. Appellee was tried before a jury on charges of first degree murder, third degree murder and involuntary manslaughter. At the close of the Commonwealth's case, the trial judge granted a judgment of acquittal on the first degree murder count. On July 12, 2004, the jury was charged on third degree murder and involuntary manslaughter. The next day, after the jurors had deliberated for some time, the jury sent a note to the judge stating that they were hopelessly deadlocked. The jury was then called into the courtroom and the following exchange took place:

> THE COURT: Was there an agreement on any of the two charges?
>
> THE FOREMAN: Yes, Your Honor.
>
> THE COURT: There was?
>
> THE FOREMAN: Yes.
>
> THE COURT: What was the agreement?
>
> THE FOREMAN: That we had agreement on involuntary manslaughter—
>
> JUROR: No.
>
> THE FOREMAN: I mean third degree, I am sorry.
>
> THE COURT: You agreed on third degree?
>
> JUROR: No.
>
> THE FOREMAN: No, we did not agree, I am sorry.
>
> THE COURT: You did not agree. And you did not agree on involuntary?
>
> THE FOREMAN: We had—some did agree on involuntary.
>
> THE COURT: All right. The point is, is there any possibility of a verdict in this case?
>
> THE FOREMAN: At this point, Your Honor, I don't think so.
>
> THE COURT: Okay.
>
> Well, I asked you before, and I will ask you again, if any further deliberations will prove fruitful I will send you back. But if you don't think so then we'll just end it right here. Does anybody on the jury think that further deliberations will be worthwhile? No response.
>
> THE COURT CRIER: For the record, there is nothing on the verdict sheet.
>
> THE COURT: All right. Okay. This case will have to be retried before another jury. That's the problem.
>
> As the foreman, you are telling me there is no hope for a decision in this case?
>
> THE FOREMAN: No, sir.
>
> THE COURT: Okay. All right. With that, the jury will be discharged. And I thank you for trying, and thank you for your services. This case will have to be retried on another date before probably a different jury, maybe even a different Judge. But thank you anyway. With that, you are free to talk about the case when you leave.
>
> (Jurors are excused).

THE COURT: We'll declare it a mistrial.

(N.T., 7/13/04, at 7–9).

¶ 3 Defense counsel then requested to speak to the jurors and the judge replied that he had "no problem with that at all." (*Id.* at 9–10). First, however, counsel moved for bail. Following a short bail hearing, defense counsel once again asked the judge if he could speak to the jury. The judge again gave his permission, and defense counsel, the prosecutor and the trial judge all proceeded into the jury room. What transpired in that room is not transcribed. However, the trial judge described the events as follows:

> On the marker-board in the jury room, the jury had recorded its verdicts for manslaughter and third-degree murder. According to the information on the marker-board, the jury was unanimous in finding that the defendant was not guilty of third-degree murder but was not unanimous on the manslaughter charge.
>
> The judge asked the jurors if this was their verdict and they said yes. The jurors had become confused about how they were supposed to render a verdict and thought that they were required to find on third-degree murder and manslaughter jointly. It was the jury's unanimous decision that the defendant was not guilty of third degree murder. The jury was deadlocked on manslaughter. Therefore, the jury had not delivered its true verdict in court.

(Trial Ct. Op. at 1).

¶ 4 Following this discovery, the trial judge reassembled the jury in the courtroom.

> THE COURT: On the record. After the jury went to the jury room there was a conversation concerning the understanding of my question, and the jury explained that they did not fully understand what I was asking. And that in fact, they all had agreed that it was not guilty as to third degree murder. The only thing that they could not agree on is whether or not it was involuntary manslaughter. So with that, Counsel requested that the jury be re-established into the jury box where they are now.
>
> And I ask the foreman to rise and announce to the Court what was the decision of the jury on third degree murder?
>
> THE FOREMAN: Third degree?
>
> THE COURT: Yes.
>
> THE FOREMAN: Not guilty.
>
> THE COURT: Did everyone agree to that?
>
> JURORS: Yes.
>
> [DEFENSE COUNSEL]: Judge, can you pole (sic) the jury on that issue.
>
> THE COURT: Everybody just said, yes. Everybody just said, yes.
>
> JURORS: Yes.
>
> THE COURT: Okay. Is there anybody that says, no? (No response from the jury.)
>
> Okay. The jury had unanimously said that it was not guilty as to third degree murder. As to involuntary could you agree?
>
> THE FOREMAN: Involuntary we had some that agreed.
>
> THE COURT: Some agreed and some did not.
>
> THE FOREMAN: Some did not, yes.
>
> THE COURT: Okay. So that's where the jury was deadlocked. Okay. With that, the jury can retire.
>
> [DEFENSE COUNSEL]: Can they fill out the verdict slip correctly and sign it then.
>
> THE COURT: Sure.

[DEFENSE COUNSEL]: I still would like to talk to the jury when we're done.

THE COURT: If you want to, go ahead.

[DEFENSE COUNSEL]: Before you leave the bench, could you then record that verdict officially as not guilty to third degree.

THE COURT: All right. Not guilty of third, and hopelessly deadlocked on involuntary.

(N.T., 7/13/04, at 20–22).

¶ 5 On July 21, 2004, the Commonwealth filed a Motion to Set Aside Illegal Verdict. Following a hearing on July 27, 2004, the motion was denied. This timely appeal follows.

¶ 6 The Commonwealth's sole issue on appeal challenges the jury's not guilty verdict on the charge of third degree murder as a "legal nullity." (Commonwealth's Brief at 15).

■ ¶ 7 Preliminarily, we must address Appellee's motion to quash the appeal, which she argues is "premature" since Appellant still faces an outstanding charge of involuntary manslaughter. (Motion to Quash the Commonwealth's Appeal, at ¶ 7). Because the Commonwealth did not seek permission from the court for an interlocutory appeal, Appellee contends that it must be quashed.[1]

¶ 8 We agree that this case is an anomaly. At first glance, it appears that the Commonwealth is appealing a verdict of acquittal, which is clearly impermissible. However, because of the unique procedural posture of this case, we find the Commonwealth's appeal proper. In *Commonwealth v. Hughes*, 468 Pa. 502, 364 A.2d 306 (1976), the Pennsylvania Supreme Court allowed an appeal from an order quashing as unconstitutionally vague one of three indictments returned by the grand jury against the defendant. The Court found that the order was

> without question the final order as to the indictment founded upon Section 3302(b). Further it was appropriate for the Commonwealth to hold the trial on the unaffected indictments in abeyance until the resolution of the instant issue. *Commonwealth v. Campana*, 452 Pa. 233, 304 A.2d 432 (1973), vacated and remanded, *Pennsylvania v. Campana*, 414 U.S. 808, 94 S.Ct. 73, 38 L.Ed.2d 44 (1973), re-established *Commonwealth v. Campana*, 455 Pa. 622, 314 A.2d 854 (1974).

*Id.* at 308 n. 2. Although the charge at issue here was not dismissed by pretrial order of the trial court, the same principles apply. As we find *infra*, the court had no authority to dismiss the deadlocked verdict on third degree murder once it was recorded and the jury dismissed. The court's actions were clearly final as to that charge. Thus, we find the appeal proper, and deny Appellee's motion to quash.

■ ¶ 9 The Commonwealth contends that the not guilty verdict on the charge of third degree murder is a legal nullity, since it was entered after the jury initially announced that it was unable to reach a verdict, and was discharged. We agree.

■ ¶ 10 It cannot be disputed that a jury's recorded verdict is inviolate. "The established rule is that the verdict as recorded is the verdict of the jury and the latter shall not be permitted to impeach or to alter or amend it after their separation

---

1. We note also that the Commonwealth did not include a Pa.R.A.P. 311(d) certification in its Notice of Appeal. However, in response to Appellee's motion to quash, the Commonwealth moved to amend its Notice of Appeal to include the proper certification. Because we find, *infra*, that the order is appealable as of right, we need not address the Commonwealth's request to amend.

or discharge." *Commonwealth v. Johnson*, 359 Pa. 287, 59 A.2d 128, 129 (1948). "Moreover, once the jury has been discharged and has dispersed, the verdict can no longer be molded by the trial judge." *Commonwealth v. Dzvonick*, 450 Pa. 98, 297 A.2d 912, 914 (1972). Indeed,

> [a]fter the verdict has been recorded and the jury discharged, only in extremely exceptional cases may the verdict be molded and even then only unless to make the corrected verdict conform to the obvious intention of the jury, i.e., to conform to a verdict actually rendered, but informally or improperly stated in writing.

*Id.* at 914 n. 4 (internal quotations omitted).

¶ 11 The Supreme Court's decision in *Johnson, supra,* is instructive. In *Johnson,* the defendant was tried for murder. Upon completion of the jury's deliberations, the foreman announced a verdict of "Not guilty." *Id.* at 129. Immediately thereafter, the judge recorded the verdict and the jury was dismissed. However, the next morning the jury reassembled to announce that they had rendered an incomplete verdict, and that they had found the defendant guilty of voluntary manslaughter. A poll of the jury revealed all to be in agreement with the amended verdict. Although defense counsel objected, noting that the jury had been dismissed and had left the courtroom, the judge explained,

> I will agree that the Jury had been dismissed and most of them had left the Court room, when some appeared and stated they could not go home because they were worried sick about the verdict because it was not the correct verdict, not the complete verdict; * * * but most of them had gone. I will agree to that.

*Id.* The judge then sentenced the defendant on the voluntary manslaughter conviction.

¶ 12 On appeal, the Supreme Court held that the conviction could not stand.

> The jury in this case had ample opportunity prior to their dispersion to correct any error in their announced verdict. They heard the verdict censured by the trial judge without any one of them indicating that the verdict so announced was not the verdict agreed upon ... The judge's act in later reassembling those who had constituted the jury was in law a nullity.

> * * *

> Not only are reason and authority against the position taken by the Commonwealth in this case, but a consideration of the evil consequences would follow permitting a jury to reassemble and alter its verdict on the ground of mistake, should itself deter courts from sanctioning such practice. If this practice were judicially sanctioned, a jury might acquit a defendant of a crime and then a day, a week or a month later reassemble and declare that the verdict was a mistake, that they intended to find the defendant guilty and would then proceed to do so. To permit such a disorderly practice in the administration of justice is unthinkable. It is the antithesis of due process of law.

*Id.* at 131.

¶ 13 Acknowledging that this decision is "[t]he major case in this area in Pennsylvania," Appellee, nevertheless, attempts to distinguish *Johnson* on its facts. Appellee notes that in the present case, unlike *Johnson,* the jury "never dispersed." (Appellee's Brief at 20). Rather, the jury remained in the jury room, without any other contact, until the court heard brief argument on bail. When the trial judge,

defense counsel, and the prosecutor entered the jury room, they noticed that the blackboard "clearly indicated what the jury's intentions were since each juror on the blackboard had written the words not guilty to the charge of murder of the third degree. The judge then immediately reassembled the jury in the courtroom and took the correct verdict from the jury." (*Id.*).

¶ 14 We find Appellee's attempt to distinguish the cases specious. Here, as in *Johnson*, the judge announced the verdict of the jury, *i.e.* no verdict, and gave the jurors the opportunity to correct the verdict as stated. None of the jurors spoke up. Moreover, unlike in *Johnson*, it appears here that either the judge or defense counsel approached the jurors regarding their inaccurate verdict after seeing the votes on the blackboard; the jurors did not approach the court staff about their mistake. Further, the fact that the jurors never left the court house is a distinction without a difference. Once the original verdict was recorded, and the jury was discharged, its authority to alter that verdict ceased. And, although the trial court and Appellee indicate that the jurors were not exposed to any outside influences between the time they were discharged and the time they were reassembled in the courtroom, we have no record evidence of this, *i.e.*, no testimony from any of the jurors themselves or the court staff. Indeed, such testimony might be irrelevant in any event since it appears that some person, whether the trial judge or defense counsel, questioned the jurors about their

verdict after seeing their recorded votes on the marker board. We would be hard pressed to conclude that this "discussion" did not constitute an outside influence. As in *Johnson*, the amended verdict here is a legal nullity.[2]

¶ 15 The trial court attempts to justify its actions by invoking an "in-the-interests-of-justice" rationale.

> It is the trial judge's review of the conditions and activities surrounding the trial which leaves him in the best position to make determinations regarding the fairness of the process and its outcome. It is apparent, therefore, if a trial court determines that the process has been unfair or prejudicial, even where the prejudice arises from actions of the court, it may, in the exercise of its discretionary powers, grant a new trial "in the interests of justice."

*Commonwealth v. Powell*, 527 Pa. 288, 590 A.2d 1240, 1243 (1991). In its Opinion, the trial court explains:

> In the instant case, judicial intervention to allow the jury to correct a mistakenly recorded verdict was required in order to prevent defendant from being tried a second time for a charge for which the jury intended her to be acquitted.

(Trial Ct. Op. at 3). Laudable as its intentions were, the court had no authority to reassemble the jury to allow them to render a different verdict than the one previously announced and recorded. This case involves neither clerical error in the recording of the verdicts, *Commonwealth v. Hafner*, 89 Pa.Super. 173 (1926), nor the

---

2. Appellee also implies that the Commonwealth's claim should be waived because the prosecutor failed to object when the jury was reassembled. We find, however, that the Commonwealth's timely post trial motion to set aside the verdict preserved the issue for our review. *See Commonwealth v. Shain*, 324 Pa.Super. 456, 471 A.2d 1246, 1251 (1984)

(finding appellant's claim that court's recording of third degree murder verdict before discovery of inconsistency on verdict sheet dissuaded jury from returning verdict of voluntary manslaughter waived since appellant failed to either object at trial **or** include issue on written post trial motion).

announcement of a guilty verdict for an uncharged crime, *Commonwealth v. Johnson*, 369 Pa. 120, 85 A.2d 171 (1952). Indeed, as the court admits, "[a] hung jury was a plausible enough result that the court did not inquire, and indeed had no reason to suspect, that the announced verdict was not what the jury intended … [and] it was only by happenstance that the judge shortly thereafter came across information which made him question the jury's understanding of the distinction between the various charges." (Trial Ct. Op. at 4). Once the verdict was announced and recorded, and the jury was discharged, neither the judge nor the jury had any power to change the verdict. *See Dzvonick, supra* (holding judge had no authority to mold jury verdict of guilty of assault with intent to maim to guilty of attempted assault charge); *Commonwealth v. Blatstein*, 231 Pa.Super. 306, 332 A.2d 510 (1974) (holding judge had no authority to mold verdict of guilty of extortion to guilty of attempted extortion, even though attempt crime was one jury was charged).

¶ 16 Therefore, we reverse the Order denying the Commonwealth's Motion to Set Aside Illegal Verdict, and remand for reinstatement of the charge of third degree murder.

¶ 17 Order reversed. Case remanded for proceedings consistent with this Opinion. Jurisdiction relinquished.

¶ 18 Motion to Quash Appeal denied.