**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 14-3485
_____

AUDREY MCDANIELS

v.

WARDEN CAMBRIDGE SPRINGS SCI;
THE ATTORNEY GENERAL OF THE
STATE OF PENNSYLVANIA;
THE DISTRICT ATTORNEY PHILADELPHIA, PA,
Appellants
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court No. 2-11-cv-05679
District Judge: The Honorable Cynthia M. Rufe

Argued April 13, 2016

Before: AMBRO, SMITH, *Chief Judge*[1] and KRAUSE,
*Circuit Judges*

(Filed:  July 6, 2017)


Salvatore C. Adamo          **[ARGUED]**
1866 Leithsville Road
Hellertown, PA  18055
      *Counsel for Appellee*

---

[1] Honorable D. Brooks Smith, United States Circuit Judge for the Third Circuit, assumed Chief Judge status on October 1, 2016.

Max C. Kaufman                    **[ARGUED]**
Molly S. Lorber
Philadelphia County Office of District Attorney
3 South Penn Square
Philadelphia, PA  19107
        *Counsel for Appellant*


_____

OPINION[2]
_____


SMITH, *Circuit Judge*.

Although the jurors in Audrey McDaniels' case initially miscommunicated to the trial judge that they were unable to return a verdict on the charge of third degree murder, they subsequently confirmed in open court that in fact they had unanimously found McDaniels not guilty of that charge.  The trial court then recorded a not guilty verdict.  The Commonwealth of Pennsylvania successfully appealed the trial court's refusal to set aside the not guilty verdict.  Thereafter, the Commonwealth tried McDaniels a second time.  The second jury found McDaniels guilty of third degree murder, and she received a sentence of 15 to 30 years of imprisonment.  Eventually she filed a habeas petition pursuant to 28 U.S.C. § 2254.  The District Court concluded that the retrial violated McDaniels' rights under the Double Jeopardy Clause of our Constitution and granted

---

[2] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

relief.  The Commonwealth appealed.[3]  For the reasons set forth below, we will affirm the judgment of the District Court.

I.

Brahim Dukes, an 18 year old with significant physical disabilities, died of starvation and dehydration in December of 2001.  At the time of his death, Brahim was in the custody of McDaniels, who was his stepmother.  This horrific crime resulted in the Commonwealth charging McDaniels with, *inter alia*, third degree murder and involuntary manslaughter.  The matter proceeded to trial, and on the first day of deliberations the jury advised the court that it was deadlocked on the charges.  Court adjourned for the day and the jury went home.

The following morning, the jury resumed its deliberations.  Later that afternoon, they again advised the court by a note that they were deadlocked.  The jury returned to the courtroom, and once they were seated in the jury box, the following exchange occurred:

> Court:     For the record, the jury sent exhibit number four.  "Your Honor, we are hopelessly deadlocked at this time and unable to reach a verdict."
> Now, there were two separate charges in this case.
> Who is the foreman or forelady?
> Foreman, stand up please.
> (Juror complies).

> Court:     Was there an agreement on any of the two charges?

> Foreman:        Yes, Your Honor.

---

[3] The District Court exercised jurisdiction under 28 U.S.C. § 2254.  We have appellate jurisdiction under 28 U.S.C. §§ 2253(a) and 1291.

3

Court:     There was?

Foreman: Yes.

Court:     What was the agreement?

Foreman:         That we had an agreement on involuntary manslaughter --

Juror:           No.

Foreman:         I mean third degree, I am sorry.

Court:     You agreed on third degree?

Juror:           No.

Foreman:         No, we did not agree, I am sorry.

Court:     You did not agree. And you did not agree on involuntary?

Foreman:         We had -- some did agree on involuntary.

Court:     All right.  The point is, is there any possibility of a verdict in this case?

Foreman:         At this point, Your Honor, I don't think so.

Court:     Okay.  Well, I asked you before, and I will ask you again, if any further deliberations will prove fruitful I will send you back.  But if you don't think so then we'll just end it right here.  Does anybody on the jury think that further deliberations will be worthwhile?
    No response.

Court Crier:     For the record, there is nothing on the verdict sheet.

Court:     All right.  Okay.  This case will have to be retried before another jury. That's the problem.
    As the foreman, you are telling me there is no hope for a decision in this case.

Foreman:         No sir.

A98-99.

4

Despite the red flags raised by the foreman's initial indication that there was an agreement and the immediate contradictions from another juror, the trial judge failed to step back and take the time necessary to "scrupulous[ly]" consider whether "manifest necessity" required the declaration of a mistrial. *United States v. Jorn*, 400 U.S. 470, 485 (1971) (plurality opinion). Instead of carefully examining the foreman and jury to "assure himself that the situation warrant[ed] action on his part foreclosing [McDaniels] from a potentially favorable judgment," *id.* at 486, the trial judge simply declared a hung jury and discharged them. He and counsel then proceeded to the jury room.

Upon entering the deliberation room, the trial judge was confronted with something remarkable: "On the blackboard each juror had voted, not guilty, right on down the line," on the third degree murder charge. A107. According to the judge, after the jurors returned to the deliberation room they discussed the court's questions concerning their ability to reach a verdict. When the judge entered that room, the jury explained that it "did not fully understand what [he] was asking. And that in fact, they all had agreed that it was not guilty as to third degree murder. The only thing they could not agree on [was] whether or not it was involuntary manslaughter." A101. McDaniels' counsel then asked that the "jury be re-established into the jury box" and the court granted that request. A101.

Having returned to the courtroom, the trial judge placed on the record what took place when he and counsel entered the jury room. He then "ask[ed] the foreman to rise and announce to the Court what was the decision of the jury on third degree murder."

5

A101. The foreman replied: "Not guilty." *Id.* The court inquired: "Did everybody agree to that [verdict]?" A102. "Everybody . . . said yes." *Id.* The court posed a different question to the jurors in an effort to determine if any juror disagreed. When there was no response indicating disagreement, the court declared that the "jury has unanimously said that it was not guilty as to third degree murder." *Id.* The judge then asked: "And as to involuntary[,] could you agree?" *Id.* The foreman advised that "we had some that agreed" to the involuntary manslaughter charge and "[s]ome did not." *Id.* The trial judge noted that the deadlock was on the involuntary manslaughter charge, and he then permitted the jurors to fill out the verdict slip. McDaniels' counsel requested that the judge "record that verdict officially as not guilty as to third degree." *Id.* The trial judge agreed and announced the verdict of "[n]ot guilty of third and hopelessly deadlocked on involuntary." *Id.*

Thereafter, the Commonwealth filed a motion to set aside the not guilty verdict. At a hearing on the motion, the trial judge stated that when he and counsel walked into the jury room, he saw "on the board there was a list of all the jurors and how they voted on third degree murder. And each one of them voted[] not guilty." A107. The judge denied the Commonwealth's motion, stating that "once a person has been found not guilty by a jury, that person is not entitled to be retried a second time." A110. In a subsequent written opinion, he explained that he acted to "prevent [McDaniels] from being tried a second time for a charge for which the jury intended her to be acquitted. Changing the jury's verdict was necessary to prevent defendant from being placed in

6

double jeopardy as prohibited by the federal constitution." A436. The judge further noted in his written opinion that he "did not attempt to influence the jurors in any way when he addressed them after the verdict was recorded, and was indeed surprised to see the marker-board that contained the jury's unanimous votes for acquittal on the third-degree murder charge." A437-38.

The Commonwealth appealed. McDaniels' brief in opposition did not explicitly invoke the Double Jeopardy Clause. Nonetheless, after a thorough factual recitation, counsel asserted that the "Commonwealth is *seeking to overturn the verdict of not guilty on murder of the third degree*." A505 (emphasis added). Counsel argued that it would be a tragedy if McDaniels were to "be retried on third degree murder." A513.

The Pennsylvania Superior Court began its analysis of the appeal by stating: "At first glance, it appears that the Commonwealth is appealing a verdict of acquittal, which is clearly impermissible." *Commonwealth v. McDaniels*, 886 A.2d 682, 686 (Pa. Super. Ct. 2005). The Superior Court, however, focused on the unusual procedural history of the case and declared that the trial "court had no authority to dismiss the deadlocked verdict on third degree murder once it was recorded and the jury dismissed." *Id.* It determined that the not guilty verdict on third degree murder was "a legal nullity." *Id.*

On remand, a second trial followed in May of 2007. That jury convicted McDaniels of third degree murder and acquitted her on the involuntary manslaughter

7

charge. The trial court sentenced McDaniels to 15 to 30 years of imprisonment.[4] McDaniels' subsequent direct appeal and her petition for post-conviction relief were unsuccessful. This § 2254 petition followed, which asserts that the retrial following the not guilty verdict in the first trial violated the Double Jeopardy Clause. In a comprehensive opinion, District Judge Cynthia M. Rufe agreed and granted relief under § 2254. The Commonwealth filed this timely appeal.

II.

The Commonwealth contends that McDaniels' double jeopardy claim is procedurally defaulted and that we cannot reach its merits. Our review of whether a habeas petitioner has fairly presented and exhausted a constitutional claim is plenary. *Greene v. Palakovich*, 606 F.3d 85, 93 n.3 (3d Cir. 2010).

In determining whether McDaniels exhausted her double jeopardy claim, we start by recognizing that "the most fundamental rule in the history of double jeopardy jurisprudence has been that '[a] verdict of acquittal . . . could not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the Constitution.'" *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571 (1977) (quoting *Ball v. United States*, 163 U.S. 662, 671 (1896)). "The underlying idea, one that

---

[4] McDaniels served one year and eight months by the time the trial court denied the Commonwealth's motion to set aside the not guilty verdict in the first trial. Together with the years of imprisonment served since her May 2007 conviction, she has already served more than eleven years of her sentence. It is worth noting that a conviction for involuntary manslaughter is a misdemeanor of the first degree subject to only a five year term of imprisonment. *See* 18 Pa. Con. Stat. §§ 1104, 2504.

8

is deeply ingrained in at least the Anglo-American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense . . . ." *Green v. United States*, 355 U.S. 184, 187 (1957). The Court in *Green* declared that it "is one of the elemental principles of our criminal law that the Government cannot secure a new trial by means of an appeal even though an acquittal may appear to be erroneous." *Id.* at 188 (citing *Ball*, 163 U.S. at 671). In *Benton v. Maryland*, the Supreme Court "f[ou]nd that the double jeopardy prohibition of the Fifth Amendment represents a fundamental ideal in our constitutional heritage," and it held that the prohibition applies "to the States through the Fourteenth Amendment." 395 U.S. 784, 794 (1969).

Whether McDaniels exhausted her double jeopardy claim requires consideration of whether Pennsylvania's state courts were given "an initial opportunity to pass upon and correct" the alleged violation of this fundamental right against double jeopardy. *Picard v. Connor*, 404 U.S. 270, 275 (1971) (internal quotation marks and citation omitted); *see also O'Sullivan v. Boerckel*, 526 U.S. 838, 844 (1999) (reiterating that state courts must be given "a fair opportunity to act" on a state prisoner's claims (emphasis omitted)). The doctrine of exhaustion "prevent[s] 'unnecessary conflict between courts equally bound to guard and protect rights secured by the Constitution.'" *Picard*, 404 U.S. at 275 (quoting *Ex Parte Royall*, 117 U.S. 241, 251 (1886)). Thus, the habeas petitioner must "present the state courts with the same claim he urges upon the federal court." *Id.* at 276. While the claim must be "brought to the attention of the state courts," a state

9

petitioner is not required to "cit[e] 'book and verse on the federal constitution'" to satisfy the exhaustion requirement. *Id.* at 278 (omitting citation). Rather, *Picard* "simply h[e]ld that the *substance* of the federal habeas corpus claim must first be presented" to the state courts. *Id.* (emphasis added); *see also Baldwin v. Reese*, 541 U.S. 27, 32 (2004) (concluding a state prisoner must "alert" the state court to the claim in her petition or brief and cannot rely on reference to the claim in a lower court opinion).

The record before us confirms that the issue of whether McDaniels could be retried in light of the not guilty verdict was entertained by the trial court when it considered the Commonwealth's motion. The trial court recognized the double jeopardy issue and denied the Commonwealth's motion to set aside the not guilty verdict on the basis that "once a person has been found not guilty by a jury, that person is not entitled to be retried the second time." A110. In its opinion denying the motion, the trial court explained that McDaniels could not be retried again or she would be "placed in double jeopardy, as prohibited by the federal constitution." A436.

McDaniels' appellate brief, opposing the Commonwealth's appeal to Superior Court, asserted that the trial court's order should be affirmed because the "Commonwealth is *seeking to overturn the verdict of not guilty* on murder of the third degree and has asked this Honorable Court to review the same." A505 (emphasis added). As we explained above, when an appellant alleges the State is seeking to overturn a not guilty verdict, an appellant has explicated the sine qua non of a double jeopardy claim. *See Martin Linen Supply*, 430 U.S. at 571 ("Perhaps the most fundamental rule in the

10

history of double jeopardy jurisprudence has been that '[a] verdict of acquittal . . . could not be reviewed, on error or otherwise, without putting [a defendant] twice in jeopardy, and thereby violating the Constitution.'" (quoting *Ball*, 163 U.S. at 671)); *see also Gregg v. Georgia*, 428 U.S. 153, 199 n.50 (1976) (plurality opinion) ("The suggestion that a jury's verdict of acquittal could be overturned and a defendant retried would run afoul of the Sixth Amendment jury-trial guarantee and the Double Jeopardy Clause of the Fifth Amendment."). Thus, even though McDaniels' brief failed to cite chapter and verse of the Constitution or even to invoke the term "double jeopardy,"[5] her statement that the State sought to overturn her not guilty verdict "brought [her double jeopardy claim] to the attention" of the Superior Court. *Picard*, 404 U.S. at 277. In short, there was no need for the Superior Court to read beyond McDaniels' brief to glean her claim. Her brief, which also contained a detailed factual description, "alert[ed]" the Superior Court to her double jeopardy claim, which challenged the Commonwealth's attempt to overturn the not guilty verdict. *Baldwin*, 541 U.S. at 32.

The Superior Court understood the basis of McDaniels' opposition to the Commonwealth's appeal. Indeed, as noted above, that court began its analysis by stating: "At first glance, it appears that the Commonwealth is appealing a verdict of acquittal, which is clearly impermissible." *McDaniels*, 886 A.2d at 686. That, quite simply, is the stuff of which double jeopardy is made.

---

[5] Not even the Fifth Amendment contains the phrase "double jeopardy." *See* U.S. Const. amend. V ("[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb.").

11

We conclude that McDaniels' argument in her brief opposing the Commonwealth's motion presented the Superior Court with the "substance of [her] federal habeas corpus claim." *Picard*, 404 U.S. at 278. We also conclude that, inarticulately as it may have been framed, the claim McDaniels advanced was a claim of double jeopardy, and it has been exhausted.[6]

Because the Superior Court acknowledged that the foundation of McDaniels' opposition to the Commonwealth appeal was the constitutional guarantee against double jeopardy, and because the Superior Court denied McDaniels the relief she was seeking, we may "presume[] that the state court adjudicated the claim on the merits." *Harrington v. Richter*, 562 U.S. 86, 99 (2011); *see also Johnson v. Williams*, 133 S. Ct. 1088, 1091 (2013) (concluding that the *Richter* presumption also applies when a state court decision addresses some issues, but does not expressly address the federal claim). Accordingly, our review is governed by 28 U.S.C. § 2254(d)(1).

III.

In *United States v. Jorn*, the Supreme Court declared that "a defendant is placed in

---

[6] The Commonwealth (and the dissent) contend that a state court's sua sponte consideration of a federal claim cannot satisfy the exhaustion requirement. Because we have concluded that McDaniels presented the substance of her claim to the state court, we need not resolve this issue. Nonetheless, as we previously noted, the Supreme Court has "recognized exceptions to th[e] general rule" of exhaustion "'where the State has actually passed upon the claim . . . .'" *Sharrieff v. Cathel*, 574 F.3d 225, 228 n.4 (3d Cir. 2009) (quoting *Castille v. Peoples*, 489 U.S. 346, 351 (1989)); *see also Jones v. Dretke*, 375 F.3d 352, 354-55 (5th Cir. 2004). In such a situation, the state court has already had an opportunity to avoid any constitutional violation, and requiring re-presentation of a claim will not avoid "friction between the state and federal court systems." *O'Sullivan*, 526 U.S. at 845.

jeopardy in a criminal proceeding once the defendant is put to trial before the trier of the facts, whether the trier be a jury or a judge." 400 U.S. at 479 (citing *Green*, 355 U.S. at 188). "Acquittals, unlike convictions, terminate the initial jeopardy." *Justices of Bos. Mun. Ct. v. Lydon*, 466 U.S. 294, 308 (1984). In determining what constitutes an acquittal, the Court in *Martin Linen* instructed that the focus of the inquiry is whether there has been a "resolution, correct or not, of some or all of the factual elements of the offense charged." 430 U.S. at 571. That is, did the government prove its case beyond a reasonable doubt? *See id.* at 572. Was there a determination that the evidence was "legally insufficient to sustain a conviction"? *Id.* It is a question of whether, once jeopardy has attached, there has been a determination regarding the defendant's guilt or innocence. *United States v. Scott*, 437 U.S. 82, 98 & n.11, 99-100 (1978).

Here, there can be no dispute. Jeopardy attached once the jury was empaneled. Because the jury confirmed in court that it unanimously had determined McDaniels was not guilty of third degree murder, there was a substantive determination that the Commonwealth failed to prove its case. Indeed, at oral argument before us, the Commonwealth acknowledged that it did "not dispute that [what occurred] meets the very broad and easily met definition of acquittal." *See* Oral Argument at 12:04 -12:13, *McDaniels v. Warden Cambridge Springs SCI*, No. 14-3485 (April 13, 2016).

The unconstitutionality of reviewing a verdict of acquittal had its genesis in *Ball v. United States*, 163 U.S. 662 (1896). There, three defendants were tried for murder. 163 U.S. at 663. Millard Ball was acquitted by a jury. *Id.* at 664. Millard Ball's brother,

13

John Ball, and Robert Boutwell were found guilty.  John Ball and Boutwell successfully appealed, obtaining a reversal of their convictions on the basis that the indictment was fatally defective.  A new indictment was returned against all three defendants and they objected to their retrial on double jeopardy grounds.  Despite their objections, the second trial was held and the three men were convicted of murder.  They appealed.

Addressing Millard Ball's appeal, the Supreme Court pointed out that he had been acquitted by the jury and that the insufficiency of the indictment did not factor into his freedom.  *Id.* at 670.  The Court declared that Millard Ball's "acquittal by verdict of the jury could not be deprived of its legitimate effect."  *Id.*  It then articulated the bedrock principle of double jeopardy jurisprudence, stating:

> As to the defendant who had been acquitted by the verdict duly returned and received, the court could take no other action than to order his discharge.  The verdict of acquittal was final, and could not be reviewed, *on error or otherwise*, without putting him twice in jeopardy, and thereby violating the constitution.

*Id.* at 671 (emphasis added).

The Supreme Court has steadfastly applied this rule from *Ball*, even where the acquittal was clearly erroneous.  For example, in *Fong Foo v. United States*, during the testimony of the government's fourth witness, the trial court directed the jury to return verdicts of acquittal as to all defendants.  369 U.S. 141, 142 (1962) (per curiam).  The United States filed a petition for a writ of mandamus seeking vacatur of the judgments of acquittal, which the First Circuit granted.  The Supreme Court granted certiorari.  Although Justice Clark dissented on the basis that the trial court lacked the "power" to direct the verdicts of acquittal in the midst of the government's case in chief and that the

14

judgments were a "nullity," *id.* at 144 (Clark, J., dissenting), the majority was not persuaded. It followed *Ball* and determined that, even though the acquittals by the jury were based on an "egregiously erroneous foundation," retrial was barred under the Double Jeopardy Clause. *Id.* at 143.

In *Smith v. Massachusetts*, the Supreme Court concluded that a midtrial Rule 29 acquittal was a "substantive determination that the prosecution ha[d] failed to carry its burden" on one of the crimes charged. 543 U.S. 462, 468 (2005). That ruling, though based on the court's misapprehension of the government's evidence in chief, barred retrial because it is "well-established . . . that the bar [to retrial] will attach to a preverdict acquittal that is patently wrong in law." *Id.* at 473. As support for this declaration, the Supreme Court cited *Martin Linen* and *Fong Foo*, as well as other cases in which there was an erroneous acquittal that nonetheless served as a double jeopardy bar to future prosecution. *Id.*; *see also Smalis v. Pennsylvania*, 476 U.S. 140, 144 n.7 (1986) (instructing that even if trial court's dismissal of certain charges after the prosecution had rested its case was wrong, it would not alter the essential character of the ruling, which was that the evidence was insufficient to establish the defendants' guilt and constituted an acquittal); *Sanabria v. United States*, 437 U.S. 54, 68-69 (1978) (concluding that acquittal based on "erroneous evidentiary ruling, which led to an acquittal for insufficient evidence," barred further prosecution); *Arizona v. Rumsey*, 467 U.S. 203, 211 (1984) (concluding that sentencing court's entry of judgment in favor of the defendant on the issue of life, even though it was based on a misconstruction of the statute, amounted

15

to an acquittal on the death penalty, which barred resentencing to death after the initial sentence of life was set aside). In fact, the Supreme Court noted in *Evans v. Michigan* that its "cases have applied *Fong Foo*'s principle broadly." 133 S. Ct. 1069, 1074 (2013).

In *McDaniels*, the Superior Court declared that Pennsylvania law does not allow a trial court to re-empanel a criminal jury that has been discharged. 886 A.2d at 688. Nevertheless, we conclude that the trial court's erroneous re-empanelment and the subsequent entry on the record of the not guilty verdict on the third degree murder charge constituted an acquittal that should have barred retrial. *Ball*, 163 U.S. at 671; *Fong Foo*, 369 U.S. at 143. Thus, the Superior Court's decision, which allowed McDaniels to be tried a second time on the third degree murder charge, resulted in a violation of McDaniels' rights under the Double Jeopardy Clause.

That conclusion does not end our inquiry, however. We must also determine whether the Superior Court's adjudication was "an unreasonable application of . . . clearly established Federal law . . . as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Our review of the Supreme Court's double jeopardy jurisprudence convinces us that, when the Pennsylvania Superior Court rendered its decision in 2005, it was well settled that even an erroneous acquittal will bar the government from retrying a defendant. *Ball*, 163 U.S. at 671; *see also Martin Linen*, 430 U.S. at 571; *Fong Foo*, 369 U.S. at 143. Yet the Superior Court in this case focused solely on the procedural impropriety of re-empaneling the jury. It did not mention *Ball*. In other words, the

16

Superior Court failed to apply *Ball*'s "most fundamental rule" regarding the acquittal by the re-empaneled jury. Given the bedrock nature of the Double Jeopardy Clause and the Supreme Court's steadfast adherence to the principle enunciated long ago in *Ball*, we conclude that the Superior Court's analysis was an unreasonable application of clearly established federal law as determined by the Supreme Court in *Ball*, *Fong Foo*, *Martin Linen,* and their progeny. *Ball* held that an acquittal "could not be reviewed, on error or otherwise, without putting him twice in jeopardy, and thereby violating the constitution." 163 U.S. at 671. Although the Superior Court recognized the error at play, it did not apply the well-established rule set out in *Ball* to the erroneous acquittal by the jury.

In an attempt to avoid the principle that an acquittal need not be error free, the Commonwealth argues that the trial court lacked jurisdiction to re-empanel the jury and enter a judgment of acquittal. It relies on the Supreme Court's observation in *Ball* that "[a]n acquittal before a court having no jurisdiction is, of course, like all the proceedings in the case, absolutely void, and therefore no bar to subsequent . . . trial in a court which has jurisdiction of the offense." 163 U.S. at 669. This exception to the *Ball* rule does not apply here. That exception is generally applicable where the trial court lacked jurisdiction at the inception of the case, such as where a prosecution is brought in the wrong county. *See, e.g.*, *Daniel v. Warden, State Corr. Inst. at Huntingdon*, 794 F.2d 880, 883-84 (3d Cir. 1986). But here there is no dispute that jurisdiction was proper at the case's inception. Nor is there any question that the trial court retained jurisdiction over the case for post-trial proceedings. Because a mistrial had been declared, the case was far

17

from over. McDaniels remained in jeopardy. Indeed, the Commonwealth implicitly recognized that the trial court still had jurisdiction over McDaniels' case when it submitted the motion to set aside the not guilty verdict. Thus, the state trial court retained jurisdiction. Even though it may have been procedurally erroneous as a matter of state law to reassemble the jury and record the not guilty verdict, under *Ball* and its progeny that verdict should have barred further prosecution on the third degree murder charge.[7]

Nor do the Supreme Court's decisions in *Serfass v. United States*, 420 U.S. 377 (1975), and *United States v. Sanford*, 429 U.S. 14 (1976) (per curiam), aid the

---

[7] We are well aware of the Supreme Court's decision in *Dietz v. Bouldin*, 136 S. Ct. 1885, 1895 (2016), and its observation that under certain circumstances, a district court may exercise its "inherent power to recall a jury" and that this power might be "limited to civil cases only." The Court further noted that "[g]iven additional concerns in criminal cases, such as attachment of the double jeopardy bar, we do not address here whether it would be appropriate to recall a jury after discharge in a criminal case." *Id. Dietz* is not controlling. We are not addressing whether the state court erred in concluding that the jury could not be recalled after it was discharged. Rather, given the impropriety under state law of entering the jury's not guilty verdict on the record, we are determining whether that erroneous acquittal barred retrial under the Double Jeopardy Clause.

The dissent makes much of the *type* of error at issue in this case, positing that the trial court acted "*ultra vires* of state law." We need not resolve the issue, but nonetheless express skepticism about this conclusion. We acknowledge that *Commonwealth v. Johnson*, 59 A.2d 128, 129 (Pa. 1948), declared, in a case in which the initial verdict of not guilty on first degree murder and voluntary manslaughter was then altered to guilty on the manslaughter charge, that "[t]he established rule is that the verdict as recorded is the verdict of the jury and the latter shall not be permitted to impeach or to alter or amend it after their separation or discharge." But the Pennsylvania Supreme Court subsequently noted that the verdict might be altered "in 'extremely exceptional cases' . . . and even then 'only unless to make the corrected verdict conform to the obvious intention of the jury[.]'" *Commonwealth. v. Dzvonick*, 297 A.2d 912, 914 n.4 (Pa. 1972). That would appear to support the trial court's action here, even if -- as the Pennsylvania Superior Court concluded -- it was wrong. Moreover, we are mindful of the Supreme Court's observation that "a jurisdictionally proper but substantively incorrect judicial decision is not ultra vires." *City of Arlington, Tx. v. FCC*, 133 S. Ct. 1863, 1869 (2013).

18

prosecution. The Commonwealth asserts that these cases demonstrate that a court may preside over a criminal action and enter a dismissal of the charges without acquitting the defendant for purposes of the Double Jeopardy Clause. This argument ignores that the district court in each of those cases dismissed the indictments before trial even commenced -- trials the government had every right to prosecute. In *Serfass*, the Supreme Court pointed out that the dismissal occurred before jeopardy had attached. 420 U.S. at 389. Thus in *Serfass*, the district court had no "power to make any determination regarding the petitioner's guilt or innocence" and the dismissal did not constitute an acquittal for double jeopardy purposes.[8] *Id.*

---

[8] The dissent relies upon *Fong Foo*, *Martin Linen*, *Smith* and *Evans* for the principle that there is "constitutional significance to whether the trial court was authorized under state law to enter the acquittal at the point it did." In the dissent's view, it is only when the trial court has the power or the authority to enter a verdict that there can be a valid acquittal barring retrial under the Double Jeopardy Clause. We are not persuaded.

We agree with the dissent that we must first ask whether there "was, in fact, a judgment of acquittal." And we acknowledge that the procedural context and the authority of the trial court—or, as the dissent contends, the "power" of the court to act— informs the determination of whether there was an acquittal barring reprosecution. Both of these considerations inform whether jeopardy actually attached and the factfinder made a determination as to the defendant's factual guilt or innocence. *See Scott*, 437 U.S. at 98-100. But there is no question in this case that jeopardy attached, or that jurisdiction was proper, or that jeopardy terminated in a unanimous jury verdict of not guilty. That resolution falls squarely within the definition of acquittal for purposes of double-jeopardy jurisprudence, notwithstanding the procedural errors that led to the acquittal. *See Martin Linen*, 430 U.S. at 571. The dissent has not identified a single case that has rejected a double-jeopardy claim under such circumstances.

Aside from cases where the trial court lacked jurisdiction, or cases where jeopardy never attached, the dissent's distinction between "evidentiary" defects and defects in "power" proves to be illusory. For example, the dissent reads *Fong Foo* as "expressly" rejecting the argument that the district court "was without power to direct acquittals." Dissent at 12. But nowhere did the Supreme Court hold, "expressly" or otherwise, that

19

Likewise in *Sanford*, the jury was deadlocked and the district court declared a mistrial. Prior to retrial, the district court dismissed the indictment. The Supreme Court concluded that *Serfass* was controlling and that the order granting dismissal of Sanford's indictment before the commencement of the retrial did not implicate the Double Jeopardy Clause because no factual determination had been made of the defendant's guilt. 429 U.S. at 16. The circumstances here are a far cry from an order dismissing an indictment without any resolution by a factfinder of the defendant's guilt or innocence, *see Scott*,

---

the district court in fact had the power to direct an acquittal before the government concluded its case-in-chief, based on, *inter alia*, a perception of prosecutorial misconduct. Rather, any lack of "power" under the applicable procedural rules was irrelevant to the Court's analysis. It was enough in *Fong Foo* that the petitioners were "tried under a valid indictment," the trial court "had jurisdiction over them and over the subject matter," the trial judge directed a return of the verdicts of acquittal and jeopardy was "terminated with the entry of a final judgment of acquittal as to each petitioner." *Fong Foo*, 369 U.S. at 143. Thus, the critical point in *Ball*, *Fong Foo*, and others is that the proceedings resolved in flawed judgments of acquittal, but judgments of acquittal all the same. That is the case here.

   *Smith* further illustrates this point. There the Supreme Court looked to the Massachusetts Rules of Criminal Procedure not to determine the trial judge's "power" to take the action it did—but rather to confirm that the trial judge's grant of a "motion for a required finding of not guilty" after the prosecution rested its case in chief was in fact an acquittal—i.e., an evaluation of the evidence and its sufficiency. 543 U.S. at 468-69. Because the trial court had concluded the prosecution failed to introduce "a scintilla of evidence" on an element of the offense, *id.* at 465, the Supreme Court determined there was an acquittal that barred further factfinding of the defendant's guilt on that particular offense. *See also United States v. Sissoon*, 399 U.S. 267, 288-90 (1970) (analyzing District Court's action in granting the Rule 34 motion for arrest of judgment, focusing on District Court's reliance upon the "evidence adduced at the trial," and concluding that the arrest of judgment "was in fact an acquittal rendered by the District Court after the jury's verdict of guilty" that could not be appealed by the government).

20

437 U.S. at 98-100,[9] and therefore neither *Serfass* nor *Sanford* support the Commonwealth's position.

In sum, we conclude that this case is governed by *Ball* and *Fong Foo*. Although the re-empanelment of the jury and the entry on the docket of the not guilty verdict may have been error according to the Pennsylvania Superior Court, it remains that the re-empaneled jury announced a unanimous verdict of acquittal of the third degree murder charge – the same verdict it had agreed upon in the sanctity of the jury room. Under clearly established Supreme Court law, the government may not subject an accused to retrial after a "verdict of acquittal . . . on error or otherwise." *Ball*, 163 U.S. at 671; *see also Fong Foo*, 369 U.S. at 143; *Martin Linen*, 430 U.S. at 570-71. The Superior Court

---

[9] In our view, it is also settled that an acquittal requires a factual determination of the defendant's guilt or innocence by judge or jury. *Martin Linen* acknowledged that it is not the label that is determinative of whether there is an acquittal, but whether what happened "actually represents a resolution, correct or not, of some or all of the factual elements of the offense charged." 430 U.S. at 571. *Scott* reinforced this by analyzing whether there had been a determination of the defendant's guilt or innocence. S*cott*, 437 U.S. at 98. A few months before the Superior Court ruled on McDaniels' case, the Supreme Court observed in *Smith* that the *Martin Linen* definition focusing on whether there had been a factual resolution had been "consistently used" in double jeopardy cases. 543 U.S. at 468. Here there is no dispute that there was a factual determination made by the jury. Yet the significance of this not guilty determination was unreasonably disregarded by the Superior Court. Indeed, *Evans,* though issued after the Superior Court's decision, confirms that the Supreme Court has been of the view that courts have understood for some time that *Scott* provided the applicable test. 133 S. Ct. at 1080 ("*Scott* has stood the test of time and we expect courts will continue to have little 'difficulty in distinguishing between those rulings which relate to the ultimate question of guilt or innocence and those which serve other purposes.'" (quoting *Scott*, 437 U.S. at 98 n.11)).

21

did not take into account this fundamental rule.[10]  Given the bedrock principle articulated

in *Ball*, it was objectively unreasonable not to apply this precedent and its progeny.[11]

      We will affirm the judgment of the District Court.

---

[10] The dissent implies that the state court's decision was reasonable because two other state courts have held double jeopardy did not bar retrial in similar circumstances.  But those state court decisions obviously were not reached in the context of a federal habeas proceeding, and therefore did not address the issue we face today: whether those state court decisions involved an unreasonable application of the Supreme Court's clearly established double jeopardy jurisprudence.  Furthermore, we note that one of those state court decisions was found unreasonable by a federal court and habeas relief was granted. *See Davenport v. Richardson*, No.14-1092, 2016 WL 299081 (W.D. La. Jan. 20, 2016), adopting No. 14-cv-1092, 2015 WL 9906262 (W.D. La. Apr. 29, 2015).  Notably, Louisiana did not appeal the District Court's decision.

[11] Had the trial judge's initial declaration of mistrial stood, there probably still would have been a solid foundation for challenging McDaniels' retrial as a violation of the Double Jeopardy Clause.  That is because, in addition to preventing retrial following a verdict of acquittal, the Double Jeopardy Clause protects a criminal defendant's "valued right to have his trial completed by a particular tribunal." *Oregon v. Kennedy*, 456 U.S. 667, 671-72 (1982) (internal quotation marks and citation omitted).  The Supreme Court has held that reprosecution following a mistrial may violate the defendant's double jeopardy rights if the prosecution is unable to "shoulder the burden of justifying the mistrial" by showing that there was a "manifest necessity" for it. *Arizona v. Washington*, 434 U.S. 497, 505 (1978); *see also id.* (describing the prosecution's burden as "a heavy one"); *United States v. Rivera*, 384 F.3d 49, 56 (3d Cir. 2004) ("Where a District Court *sua sponte* declares a mistrial in haste, without carefully considering alternatives available to it, it cannot be said to be acting under a manifest necessity. . . . Any subsequent reprosecution under those circumstances is barred by the Double Jeopardy Clause.").  The importance of the trial judge's role in ensuring that "manifest necessity" compels a mistrial cannot be overstated. *See Jorn*, 400 U.S. at 485-86.

    Here, because the trial judge sua sponte declared a mistrial without seeking input from either party, McDaniels had little opportunity to object. *Cf. id.* at 487 (noting that "the trial judge acted so abruptly in discharging the jury that, had . . . the defendant [been disposed] to object to the discharge of the jury, there would have been no opportunity to do so").  In any event, McDaniels' double jeopardy claim was not premised on the trial judge's initial declaration of mistrial.

*McDaniels v. Warden Cambridge Springs SCI*, 14-3485.
KRAUSE, *Circuit Judge*, dissenting.

If this case indeed involved a retrial following a cognizable verdict of acquittal, I would agree with the Majority that we might have overcome Petitioner's procedural default to correct a state court's unreasonable application of "clearly established" Supreme Court double jeopardy law. But that is not at all what happened here. There were two and only two legally cognizable verdicts returned by Pennsylvania juries in this case on the count of third degree murder, and neither of them was an acquittal. The first was a verdict of a mistrial, and the second, upon retrial, was a verdict of guilt. And what transpired between these two valid and lawfully entered verdicts—a state trial judge indisputably acting ultra vires under state law by purporting to re-empanel a discharged jury, to conclude in the absence of any hearing that the discharged jurors had not been tainted by the intervening off-the-record communications with defense counsel and the judge, and to supersede the final, properly recorded verdict of mistrial with an "amended verdict" of acquittal—was no "verdict" at all. Rather, as the Superior Court held on direct appeal when it set aside that "[i]llegal [v]erdict" and reinstated the third degree murder charge for retrial, the trial judge's purported entry of an "acquittal" was nothing short of a "legal nullity" under controlling Pennsylvania Supreme Court precedent. *Commonwealth v. McDaniels*, 886 A.2d 682, 686, 688 (Pa. Super. Ct. 2005) (citing *Commonwealth v. Johnson*, 59 A.2d 128, 131 (Pa. 1948)).

No wonder then that Petitioner did not raise in the state court and the Superior Court did not recognize or address any federal issue presented by this case, focusing

1

instead on Petitioner's purely state law arguments concerning the trial court's power to re-empanel a discharged jury and supersede its properly recorded verdict with a different verdict. Concluding the trial court lacked that power and thus there had been no cognizable verdict of acquittal under state law, the Superior Court had neither reason nor opportunity to address the merits of any double jeopardy claim, let alone the unusual and nuanced one that Petitioner now presents for the first time in her habeas petition, i.e., under what circumstances, if ever, a purported "amended verdict" of acquittal that a trial court had no power under controlling state law to enter at that point in the proceeding nonetheless must be treated as a valid acquittal under federal law, barring retrial under the Double Jeopardy Clause.

Yet, even though Petitioner has conceded in this appeal that she did not fairly present her double jeopardy claim to the state courts, the Majority not only posits that she did, but proceeds to hold that the Superior Court's failure to treat the ultra vires action of the trial court as a valid acquittal was an unreasonable application of "clearly established" federal double jeopardy law. Maj. Op. at 18-24; *see Harrington v. Richter*, 562 U.S. 86, 98 (2011) (citing 28 U.S.C. § 2254(d)). I respectfully dissent.

As explained below, first, even if Petitioner's claim was not procedurally barred, the Superior Court's decision did not contravene any "clearly established" Supreme Court case law; on the contrary, it was entirely consistent with a long line of Supreme Court cases—most recently *Dietz v. Bouldin*, 136 S. Ct. 1885 (2016)—that strongly indicate an "erroneous" verdict of acquittal will *only* be deemed operative for double jeopardy purposes so long as the trial court that entered it was authorized by its governing

2

rules or decisional law to do so at that point in the proceedings. And second, principles of federalism, comity, and finality prevent us from reviewing Petitioner's double jeopardy claim when it was not presented to the state courts, was not ruled on by the state courts, and fits no exception to the firm prohibition on federal review of procedurally defaulted claims. After reviewing some points on background, I will address these issues in turn.

## I.

Although the Majority has fairly summarized the factual and procedural history of this case, there are additional details that seem to me salient to understand why we should be reaching a different outcome.

Petitioner Audrey McDaniels was charged with murder and involuntary manslaughter of Brahim Dukes, a non-verbal and severely disabled teenager who was left in her care for two weeks while his father, Petitioner's boyfriend, was temporarily incarcerated for failure to pay traffic tickets. Brahim's soiled and emaciated body was found by paramedics on the floor of a bare, frigid room, which reeked of urine and feces and in which the boy apparently had been for some time. Petitioner asserted the boy had had a temper tantrum and collapsed on the floor. According to the autopsy report, however, Brahim was dead for several hours before Petitioner called 911, and his cause of death was protracted starvation and dehydration.

At her first trial, the jury reported that it could not reach a verdict on either the third degree murder charge or the involuntary manslaughter charge. The judge then engaged the foreman in an extended colloquy in which he sought to ascertain on the

3

record that the jurors had tried diligently to reach unanimity, in the end asking the foreman whether there was any possibility that through further deliberations the jury might reach a verdict, asking the entire jury whether "anybody on the jury think[s] that further deliberations would be worthwhile," and again inquiring of the foreman whether "there is no hope for a decision in this case." The responses were uniformly negative. At that point, consistent with Pennsylvania law, the trial judge declared the jury deadlocked, recorded the jury's verdict of mistrial, and discharged the jury.

The trial court then moved on to other proceedings, including a bail hearing and scheduling discussions with counsel regarding a date for Petitioner's retrial. Subsequently, on the request of defense counsel, the trial judge accompanied counsel to the jury room to debrief any jurors that might remain. There is no contemporaneous record of what occurred next. From the trial court's subsequent comments on the record, however, it appears that the judge and counsel entered the jury room and engaged in unspecified discussions about the case with the discharged jurors, who had not yet dispersed. The judge and counsel then noticed markings on the blackboard suggesting the jurors had voted unanimously at some point in their deliberations for acquittal on the third degree murder charge. The trial judge did not take testimony from counsel, court staff, or any of the jurors as to what transpired in their post-verdict exchange, but the trial judge's later explanation of his actions reflects that, in response to whatever questions or comments were posed to them, one or more of the jurors said they had been confused by the jury instructions and mistakenly thought the verdicts on the two charges needed to be returned jointly.

4

The judge then took the highly unorthodox step—prohibited by Pennsylvania law—of re-empaneling the discharged jury, soliciting from the foreperson on the record that the jury was now returning a verdict of acquittal as to the third degree murder charge, and purporting to supersede that original verdict with an "amended verdict" of acquittal. A few days later the Commonwealth filed a "Motion to Set Aside Illegal Verdict," App. 80, which the trial judge denied, explaining that his "judicial intervention" had been required "to prevent [Petitioner] from being tried a second time for a charge for which the jury intended her to be acquitted [and] . . . to prevent [her] from being placed in double jeopardy." App. 436.

The Commonwealth appealed the denial of its motion to the Superior Court, arguing on the basis of Pennsylvania rules and case law that there was no cognizable "amended verdict" because the trial court had no power to recall a jury after it had been discharged, to set aside the jury's properly returned and finally recorded verdict of mistrial, or to enter an amended verdict of acquittal. In response, Petitioner too relied on Pennsylvania state authorities[1] and made arguments, limited to state law, concerning the trial court's ability to recall the jury and "to correct a defective verdict," asserting, for example, that "[a]lthough the trial judge said [the jurors] were discharged, in reality, they were not." App. 514, 517. Petitioner styled these arguments as reasons that the "correct

---

[1] Petitioner cited exclusively to state cases, with the exception of one Fourth Circuit case on which she relied to argue that trial judges generally have power to re-empanel juries. *See* App. 516 (citing *Summers v. United States*, 11 F.2d 583 (4th Cir. 1926)). That case neither involved an amended verdict nor any double jeopardy claim.

5

verdict" should not be set aside and made no reference to double jeopardy, no arguments based on double jeopardy, and no reference to that body of federal case law.

As the Superior Court was presented with a purely state law question of the power of the trial court and was proceeding to resolve the question on that basis, it took pains at the outset of its opinion to make that clear, noting that "[a]t first glance, it appears that the Commonwealth is appealing a verdict of acquittal, which is clearly impermissible," *McDaniels*, 886 A.2d at 686, but that, on closer inspection, that was not the case at all because, under longstanding Pennsylvania Supreme Court precedent, "a jury's recorded verdict is inviolate," *id.* at 686 (citing *Johnson*, 59 A.2d at 129), and "[o]nce the original verdict was recorded, and the jury was discharged," the trial court's "authority to alter that verdict ceased," *id.* at 688 (citing *Johnson*, 59 A.2d at 131). At that point, "neither the judge nor the jury had any power to change the verdict," *id.* at 689, and the "amended verdict" under Pennsylvania law was thus a "legal nullity," *id.* at 688.

The Superior Court also noted its concern that the jury had been tainted, observing "here that either the judge or defense counsel approached the jurors regarding their inaccurate verdict after seeing the votes on the blackboard; the jurors did not approach the court staff about their mistake." *Id.* at 688. Moreover, the court observed, "although the trial court and [defendant] indicate that the jurors were not exposed to any outside influences between the time they were discharged and the time they were reassembled in the courtroom, we have no record evidence of this, *i.e.*, no testimony from any jurors themselves or the court staff," and "it appears that some person, whether the trial judge or defense counsel, questioned the jurors about their verdict after seeing their recorded votes

6

on the marker board." *Id.* Under these circumstances, the Superior Court concluded, "[w]e would be hard pressed to conclude that this 'discussion' did not constitute an outside influence." *Id.*

On retrial, Petitioner was convicted of third degree murder and acquitted of involuntary manslaughter. She then appealed, raising only state law claims pertaining to evidentiary rulings, jury instructions, and sufficiency of the evidence. When her direct appeal was not successful, she filed a pro se PCRA petition in the Court of Common Pleas in which she made a fleeting reference to double jeopardy without explaining the basis for any corresponding claim, but she dropped her appeal of the denial of that petition to the Superior Court. Petitioner next turned to the federal courts and procured counsel, arguing *for the first time* that the Superior Court's failure to treat the illegal verdict of acquittal as a valid verdict that barred retrial violated the Double Jeopardy Clause.

The Magistrate Judge, after reviewing the procedural history, observed "[t]he record reveals that the issue of double jeopardy was not raised in the state court system" and Petitioner's claim was thus unexhausted and procedurally defaulted. Accordingly, the Magistrate recommended denial and dismissal of the habeas petition without the issuance of a certificate of appealability. The District Court disagreed and held that Petitioner fairly apprised the Superior Court "of the nature of the double jeopardy claim" because "her assertion of her right not to be retried again crie[d] out that she claimed a double jeopardy violation." *McDaniels v. Winstead*, No. 11-5679, 2014 WL 2957460, at *7 (E.D. Pa. July 1, 2014).

7

Proceeding to address the merits, the District Court characterized the issue, in contrast to the Superior Court, as whether a "trial judge's error of state law" can "vitiate . . . double jeopardy protection," *id.* at \*10, that is, whether "the state-law 'legal nullity' was also a federal law nullity," *id.* at \*12, and like the Majority, the District Court perceived no distinction between Petitioner's case and the line of Supreme Court cases that have held an "erroneous acquittal" operative for purposes of double jeopardy. The District Court therefore concluded the Superior Court's decision was contrary to or an unreasonable application of clearly established double jeopardy law. *Id.* at \*11-12.

Using the same reasoning, my esteemed colleagues in the Majority will affirm. The effect of that holding—in view of the District Court's determination that Petitioner's conviction of third degree murder on retrial must be vacated, its conclusion that double jeopardy barred and will bar any retrial on the count of third degree murder, and the fact that the jury on retrial, having convicted Petitioner of third degree murder, had acquitted her on the involuntary manslaughter charge, *id.* at \*14—is that Petitioner will be deemed "not guilty" of any criminal charge in connection with Brahim's death and will be entitled to the unconditional issuance of the Great Writ.

II.

As the Majority engages the merits of Petitioner's habeas petition, I will start there, before addressing the procedural bar that I believe should have prevented us from ever going so far.

8

A.

Our standard of review is governed by the Antiterrorism and Effective Death Penalty Act ("AEDPA"), which instructs that we may not grant habeas relief to a petitioner unless, in relevant part, she is in custody pursuant to a decision that is "contrary to federal law then clearly established in the holdings of [the Supreme] Court," or "involve[s] an unreasonable application of such law." *Richter*, 562 U.S. at 100 (citing 28 U.S.C. § 2254(d)) (internal quotation marks omitted). In turn, "[a] state court decision is 'contrary to' clearly established federal law if it 'applies a rule that contradicts the governing law set forth' in Supreme Court precedent, or if it 'confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a result different from that reached by the Supreme Court.'" *Eley v. Erickson*, 712 F.3d 837, 846 (3d Cir. 2013) (quoting *Williams v. Taylor*, 529 U.S. 362, 405, 406 (2000)).

An "*unreasonable* application of federal law is different from an *incorrect* application of federal law." *Richter*, 562 U.S. at 101 (quoting *Williams*, 529 U.S. at 410). We cannot grant habeas relief simply because "we conclude[] in [our] independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411. That is, the relevant state court decision must be *more* than wrong: it "must . . . be unreasonable." *Id.* And as long as a "fairminded jurist[]" could agree with the state court's decision, it is not unreasonable. *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Put another way, we may grant the Great Writ *only* "where there is no possibility

9

fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id.* at 102. As the Supreme Court has advised, "[i]f [AEDPA's] standard is difficult to meet, that is because it was meant to be." *Id.*

B.

Petitioner's claim on federal habeas is that her retrial violated the Double Jeopardy Clause because the supposed "corrected verdict" entered by the trial court—although ultra vires and a "legal nullity" under state law—must be deemed operative as a matter of federal law. And the Majority accepts this argument. Notwithstanding the Majority's acknowledgment that Pennsylvania law "does not allow a trial court to re-empanel a criminal jury that has been discharged," Maj. Op. at 17, and that the entry of the re-empaneled jury's verdict of acquittal was an "impropriety under state law," Maj. Op. at 20 n.5, the Majority concludes "there can be no dispute" that the entry of that verdict "constituted an acquittal that should have barred retrial," Maj. Op. at 14, 17, because (1) initial jeopardy attached; (2) the trial court retained general jurisdiction over the case even post-trial; and (3) the jury, in the Majority's view, at some point made a factual determination of innocence. Maj. Op. 14, 21 n.6, 23 n.7. So long as those conditions are met, the Majority reasons, the entry of an "erroneous" verdict of acquittal bars retrial under the Double Jeopardy Clause—regardless of the nature of the error.

Facially appealing as it may be, the Majority's reasoning comports with neither the facts of this case nor Supreme Court precedent. As a threshold matter, that recitation of the conditions here ignores the central feature of this case: the intervening recording of a final verdict of mistrial and the discharge of the jury. In that circumstance, the Supreme

10

Court has held, "the [Double Jeopardy] Clause does not prevent the Government from seeking to reprosecute" because "the second trial does not place the defendant in jeopardy 'twice,'" and "the 'interest in giving the prosecution one complete opportunity to convict those who have violated its laws' justifies treating the jury's inability to reach a verdict as a nonevent that does not bar retrial." *Yeager v. United States*, 557 U.S. 110, 118 (2009) (quoting *Arizona v. Washington*, 434 U.S. 497, 509 (1978)); *see also United States v. Sanford*, 429 U.S. 14, 16 (1976) (holding that double jeopardy did not bar retrial where "[t]he District Court's dismissal of the indictment occurred several months after the first trial had ended in a mistrial, but before the retrial of respondents had begun" because as a result of the verdict of mistrial, "the Government had a right to prosecute and . . . the defendant was required to defend" (citing *Serfass v. United States*, 420 U.S. 377 (1975)).

Moreover, the Majority can assert "there is no dispute that there was a factual determination made by the jury," Maj. Op. at 23 n.7, only by disregarding the record and substituting its judgment for that of the Pennsylvania Superior Court, which reasonably concluded that—where the judge or defense counsel approached the jurors about their alleged "mistake," not vice versa; the judge or defense counsel questioned the discharged jurors about their verdict off the record; and there was no testimony from the jurors themselves or from court staff about the "discussion" that took place—the court "would

11

be hard pressed to conclude that this 'discussion' did not constitute an outside influence."

*McDaniels*, 886 A.2d at 688.[2]

More fundamentally, however, Supreme Court precedent does not support the

proposition that an "erroneous verdict" of acquittal bars retrial where the entry of the

---

[2] The Majority is content to rely on the trial judge's statement that he personally "did not attempt to influence the jurors in any way when he addressed them after the verdict was recorded." App. 437. The trial judge's individual intent is of little moment, however, especially when relayed in a later statement defending his own highly problematic handling of the situation, for that statement says nothing about what was actually said to the jury by defense counsel or the judge or the effect on the jury of whatever was discussed. Absent testimony from counsel, court staff, or the jurors themselves as to what transpired, the Superior Court was reasonably concerned about the effect of those outside influences and the reliability of the purported "amended verdict." Indeed, the serious risk of jury taint if discharged jurors are permitted later to reassemble and alter their verdict is the very reason Pennsylvania, like many jurisdictions, *see infra* Sec. II.C, maintains a rule that "the verdict as recorded is the verdict of the jury and the latter shall not be permitted to impeach or to alter or amend it after their separation or discharge," *Johnson*, 59 A.2d at 129, nor may the verdict "be molded by the trial judge," *Commonwealth v. Dzvonick*, 297 A.2d 912, 914 (Pa. 1972). And while, as the Majority notes, the Pennsylvania Supreme Court has left open the possibility "that the verdict might be altered 'in extremely exceptional cases and even then only unless to make the corrected verdict conform to the obvious intention of the jury," Maj. Op. at 20 n.5 (alterations omitted) (quoting *Dzvonick*, 297 A.2d at 914 n.4), that sentence continues with: "i.e., to conform to a verdict actually rendered, but informally or improperly stated in writing," *Dzvonick*, 297 A.2d at 914 n.4, making clear, as do other Pennsylvania authorities, that the exception is limited to the correction of clerical errors, *e.g.*, *Commonwealth v. Homeyer*, 94 A.2d 743, 747-48 (Pa. 1953) (holding that the clerk's incorrect announcement and recordation of the jury's properly returned verdict could be corrected "to read exactly as the jury found"); *Commonwealth v. Meyer*, 82 A.2d 298, 300 (Pa. Super. Ct. 1951) ("[C]lerical errors may be corrected by amendment even in a criminal case."); *see also* Burton R. Laub, Pennsylvania Trial Guide: Civil and Criminal § 244 at 415 (1959) ("[I]f the jury makes a return which, though not in proper form, adequately expresses its true findings, and the clerk records the verdict in another form, the mistake in the entry on the docket may properly be corrected to accord to the actual announcement made.") (cited in *Dzvonick*, 297 A.2d at 914 n.4).

verdict itself is ultra vires,[3] and it makes crystal clear, at a minimum, that such a

proposition is not "clearly established." For the general principle that a "verdict of

acquittal . . . on error or otherwise" is operative for double jeopardy purposes, the

Majority relies on the Supreme Court's decision in *United States v. Ball*, 163 U.S. 662

(1896), in which the Court held that retrial following a verdict of acquittal was barred

even though it was later determined that the indictment was defective, *id.* at 670-71; *see*

Maj. Op. at 15. But more specifically, the Majority relies on a series of Supreme Court

cases, including *Fong Foo v. United States*, 369 U.S. 141, 143 (1962) (per curiam);

*United States v. Martin Linen Supply Co.*, 430 U.S. 564, 570-76 (1977); *Smith v.*

*Massachusetts*, 543 U.S. 462, 469-75 (2005); and *Evans v. Michigan*, 133 S. Ct. 1069,

1074-81 (2013), in which the Supreme Court held that the particular errors underlying

those verdicts or judgments of acquittal did not affect their validity and, hence, those

erroneous acquittals still triggered the double jeopardy bar. From these cases, the

Majority generalizes that any "erroneous" acquittal bars retrial, including what it

---

[3] *City of Arlington v. FCC*, 133 S. Ct. 1863 (2013), which the Majority cites to support the notion that "a jurisdictionally proper but substantively incorrect judicial decision is not ultra vires," *id.* at 1869; *see* Maj. Op. at 20 n.5, is inapposite to this case. There, in considering whether the FCC's interpretation of its own statutory jurisdiction was entitled deference, the Supreme Court contrasted the jurisdiction of agencies with that of the courts, observing that "[w]hether [a] court decided *correctly* is a question that has different consequences from the question whether it had the power to decide at all," whereas because agencies' "power to act and how they are to act" are both "prescribed by Congress, . . . . the question . . . is always whether the agency has gone beyond" its delegated authority. *Arlington*, 133 S. Ct. at 1868-69. As far afield as this case is from the Supreme Court's double jeopardy case law, it hardly bears mention. I note, however, that the Court's statement in context, reflecting that a decision a court has power to enter is not ultra vires even if substantively incorrect, is entirely consistent with this dissent.

13

characterizes as the "erroneous re-empanelment and the subsequent entry on the record of the not guilty verdict." Maj. Op. at 17.

The fatal flaw in that reasoning is the failure to make the distinction that the Supreme Court does explicitly in these very cases. That is, the Supreme Court expressly distinguishes between one kind of "error"—in which the trial court renders an acquittal based on an improper evidentiary ruling or merits determination—and a different kind of "error"—in which the trial court lacks the power to enter the verdict at all. While the Supreme Court variously calls the latter a lack of "power," *e.g.*, *Evans*, 133 S. Ct. at 1081; *Fong Foo*, 369 U.S. at 142, or "authority," *Martin Linen*, 430 U.S. at 570, a review of its cases from *Fong Foo* to, most recently, *Dietz*, reflects that the Court—at least thus far—has treated an erroneous verdict of acquittal as nonetheless valid for purposes of double jeopardy *only* when it has fallen into the first category, namely, only where the Court has assured itself that the trial court had the power to enter the acquittal at that point in the proceeding. That is, to the extent there was "clearly established" Supreme Court case law on this subject, that law, if anything, supports the Superior Court's conclusion and the Commonwealth's argument here that a purported superseding verdict

14

of acquittal that a trial court had no power to enter is a legal nullity, devoid of double jeopardy implications.[4]

I begin with *Fong Foo*. There, the district court, outraged that a federal prosecutor spoke with a Government witness during a break in his testimony and believing the Government's witnesses to that point to be lacking in credibility, directed the jury to acquit the defendants in the middle of trial. *See In re United States*, 286 F.2d 556, 558-60 (1st Cir. 1961), *rev'd by Fong Foo*, 369 U.S. 141. The First Circuit reversed based on its conclusion that district courts lacked power under the Federal Rules of Criminal Procedure to enter a judgment of acquittal before a party had rested, so that, in its view, the district court's directed verdict of acquittal "was not only plainly erroneous but beyond his jurisdiction." *Id.* at 560. A majority of the Supreme Court reversed and held

---

[4] To the extent the Majority may be implying that the Commonwealth waived this argument, which forms the entirety of its appeal, by stating at oral argument that it did "not dispute that [what occurred] meets the very broad and easily met definition of acquittal," Maj. Op. at 14 (quoting Oral Arg. 1:48-1:55), the oral argument transcript makes clear that it did no such thing. In context, that excerpt was the Commonwealth's response to the question whether what occurred here "was in fact a determination by those twelve jurors of not guilty on the charge of third degree murder, as a matter of fact?" Oral Arg. 1:35-1:46. Declining to concede that the jury had made a factual finding of innocence and characterizing the issue presented to this Court instead as one involving "the very broad and easily met definition of acquittal," the Commonwealth immediately proceeded to argue, as it has throughout this appeal, that that "acquittal" was a legal nullity because the trial court "lacked jurisdiction" to enter it. Oral Arg. 1:50-1:59. And to the extent the Majority takes issue with the Commonwealth's references to the trial court's lack of "jurisdiction," Maj. Op. at 19, its concerns also are not well founded. There is no question that the trial court retained general jurisdiction over the case through its handling of post-trial motions. Instead, as the Commonwealth states explicitly in its briefing, it is using the term "jurisdiction" in the context of this case (as it does interchangeably with "authority" and "power") to mean "jurisdiction over the type of relief sought—acquittal," a remedy which the Commonwealth argues the trial court simply "lacked the authority" to enter. Appellant's Br. 51.

15

that, even if based on an "egregiously erroneous foundation," the verdict of acquittal was operative, *Fong Foo*, 369 U.S. at 143, while Justice Clark in dissent adopted the First Circuit's view and asserted that the district court's lack of power to enter the verdict rendered the acquittal a "nullity," *id.* at 144 (Clark, J., dissenting).

The Majority reads these opinions together as holding that an acquittal is final for double jeopardy purposes even where a trial court lacked power to enter that verdict. Maj. Op. at 16. On inspection, however, *Fong Foo* holds no such thing.

Although Justice Clark in dissent, like the First Circuit, perceived the issue as relating to the power of state courts, *Fong Foo*, 369 U.S. at 144-46 (Clark, J., dissenting), the Supreme Court majority did not, instead expressly rejecting the notion that the district court "was without power to direct acquittals under the circumstances disclosed by the record," *id.* at 142, and holding that the trial "terminated with the entry of a final judgment of acquittal," *id.* at 143, *i.e.*, a judgment cognizable precisely because the district court had power to enter it. The "egregiously erroneous foundation" to which the Court referred was the evidentiary one—the district court having based the acquittal on the prosecutor's conversation with a witness and its view of the witnesses' credibility— and the Court's holding was that, where the trial court did have power to enter the verdict of acquittal, an acquittal based on an erroneous ground was "[n]evertheless . . . final and could not be reviewed" under the Double Jeopardy Clause. *Id*.

Subsequent Supreme Court cases only reinforce the line between inaccurate or mistaken judgments of acquittal, which the Court has held still count as acquittals for double jeopardy purposes under *Fong Foo* and its progeny, and purported judgments of

16

acquittal that a trial court had no power to enter (for federal courts, under the Federal Rules of Criminal Procedure and their inherent powers, and for state courts, under their state rules of criminal procedure and state law), which the Court has at least strongly suggested would not count as acquittals at all. More significantly for purposes of this habeas action, these cases make perfectly clear that there has been—and at the time the Superior Court ruled in Petitioner's case there was—no "clearly established" Supreme Court precedent under which the states (which assuredly may define the boundaries of their own courts' jurisdiction and power) were constitutionally required to treat as valid judgments of acquittal, actions of their state judges that were ultra vires to the judges' power and therefore null and void under state law.

In *United States v. Martin Linen Supply Co.*, for example, the Supreme Court considered the validity of a judgment of acquittal entered by a district court purportedly exercising its power under federal law. 430 U.S. at 565-76. There, as here, the jury had deadlocked and the district court declared a mistrial and discharged the jury. *Id.* at 565. The defendants timely filed motions for acquittal under the version of Federal Rule of Criminal Procedure 29(c) then in effect, which provided that "a motion for judgment of acquittal may be made . . . within 7 days after the jury is discharged (and) the court may enter judgment of acquittal," *id.* at 566 (quoting Fed. R. Crim. P. 29(c) (1977)), and the district court granted those motions. In holding that this post-discharge judicial verdict of acquittal was operative to bar the Government's appeal—and rejecting the Government's argument that "(o)nce the district court declared a mistrial and dismissed the jury, any double jeopardy bar to a second trial dissolved," *id.* at 572—the Supreme Court

17

emphasized that the federal judge was expressly authorized under the Federal Rules of Criminal Procedure to act as he did, producing "valid judgments of acquittal . . . entered on the *express authority of, and strictly in compliance* with, Rule 29(c)," *id.* at 570 (emphasis added).

Likewise, Justice Stevens concluded his concurrence (which focused on what statutory appeals were authorized under the Criminal Appeals Act) by observing that, because Congress had not statutorily authorized the Government to appeal from a judgment of acquittal:

> [T]he only question presented is whether such a judgment was entered in this case. The answer to that question, as the Court demonstrates, is perfectly clear. By virtue of [Rule] 29(c), the mistrial *did not terminate the judge's power to make a decision on the merits*. His ruling, in substance as well as form, was therefore an acquittal.

*Id.* at 581 (Stevens, J., concurring) (emphasis added); s*ee also United States v. Sisson*, 399 U.S. 267, 277, 289-90 (1970) (holding that the district court's order granting defendant's "motion in arrest of judgment," which functioned as a judgment of acquittal, triggered the double jeopardy bar specifically because "Rules 29(b) and (c) of the Federal Rules of Criminal Procedure . . . expressly allow a federal judge to acquit a criminal defendant after the jury 'returns a verdict of guilty'").

In cases involving the review of state court judgments, the Supreme Court has also strongly suggested that the validity of a purported verdict of acquittal depends on whether the judge had power to enter it. In *Smith v. Massachusetts*, decided mere months before the Superior Court's opinion in the instant case, the state court entered a midtrial finding

18

of not guilty as to one count for lack of evidence but later concluded the evidence was sufficient to submit that charge to the jury, which convicted. 543 U.S. at 465-66. The Supreme Court reversed the conviction. The "first question" the Court had to answer was "whether the judge's initial ruling on petitioner's motion was, in fact, a judgment of acquittal." *Id.* at 467. As the Majority points out, the Court held that it was, even if that midtrial ruling was erroneous. *See* Maj. Op. at 16-17.

But the Supreme Court expressly based that conclusion on the fact that Massachusetts Rule of Criminal Procedure 25(a) "directs the trial judge to enter a finding of not guilty 'if the evidence is insufficient as a matter of law to sustain a conviction.'" *Smith*, 543 U.S. at 467 (quoting Mass. R. Crim. P. 25(a)). Regardless of whether Massachusetts would characterize the trial judge's finding of "not guilty" as a legal or factual conclusion, the Court explained, for double jeopardy purposes "what matters is that, *as the Massachusetts Rules authorize*, the judge 'evaluated the [Commonwealth's] evidence and determined that it was legally insufficient to sustain a conviction.'" *Id.* at 469 (emphasis added) (quoting *Martin Linen*, 430 U.S. at 572). The Court made even more clear that its assessment of the validity of the acquittal turned on whether the judge had power under state law to enter it by observing "that as a general matter state law may prescribe that a judge's midtrial determination of the sufficiency of the State's proof can be reconsidered," *id.* at 470, but "Massachusetts had not adopted any such rule," *id.* at 471. The necessary corollary, of course, is that if Massachusetts had opted to circumscribe the power of its state judges with a different rule, the trial judge's midtrial "finding" of not guilty would not have triggered the double jeopardy bar.

19

And *Evans v. Michigan*, although post-dating the Superior Court's decision, made the same point even more starkly, 133 S. Ct. at 1074-81, and thus sheds light on what was then clearly established double jeopardy law.[5]  In that case, the state trial judge entered a midtrial directed verdict of acquittal, which it was authorized to do under Michigan law, but it did so erroneously, by requiring proof of an extra element for the charged offense. *Id.* at 1073-75.  This kind of error, the Supreme Court held, fell comfortably within "*Fong Foo*'s principle," which it summarized as follows:

> [A]n acquittal precludes retrial even if it is premised upon an erroneous decision to exclude evidence; a mistaken understanding of what evidence would suffice to sustain a conviction; or a "misconstruction of the statute" defining the requirements to convict.  In all these circumstances, "the fact that the acquittal may result from erroneous evidentiary rulings or erroneous interpretations of governing legal principles affects the accuracy of that determination, but it does not alter its essential character."

*Id.* at 1074 (citations omitted).

Notably absent from the Court's survey of *Fong Foo*-type errors is the categorically different kind of error involved when a judge acts ultra vires by attempting to enter a verdict of acquittal at a point in the proceeding when it is disallowed under state law.  And that kind of "erroneous" acquittal, the Court indicated, would not operate as an acquittal for double jeopardy purposes. *Id.* at 1081.  That is, in responding to the

_____

[5] For the purposes of AEDPA, "clearly established law" includes the "holdings . . . of [the Supreme] Court's decisions as of the time of the relevant state-court decision"— here, the Superior Court's decision. *See Carey v. Musladin*, 549 U.S. 70, 74 (2006) (quoting *Williams*, 529 U.S. at 412).  But subsequent cases are relevant insofar as they reflect what was then clearly established, "clarifying the law as . . . applied to the particular facts of that case." *Lewis v. Johnson*, 359 F.3d 646, 655 (3d Cir. 2004); *see also* Brian R. Means, Federal Habeas Manual § 3:29 (2016).

20

Government's argument that the Court's holding would allow defendants to reap the benefit of trial judges' unreviewable errors, the Court explained:

> [S]overeigns are hardly powerless to prevent this sort of situation, as we observed in *Smith*. Nothing obligates a jurisdiction to afford its trial courts the power to grant a midtrial acquittal, and at least two States disallow the practice. . . . And for cases such as this . . . we see no reason why jurisdictions could not provide for mandatory continuances or expedited interlocutory appeals if they wished to prevent misguided acquittals from being entered. But having chosen to vest its courts with the power to grant midtrial acquittals, the State must bear the corresponding risk that some acquittals will be granted in error.

*Id.* (citations omitted). Again, in other words, the Court attached constitutional significance to whether the trial court was authorized under state law to enter the acquittal at the point it did.

Despite the language and reasoning of *Fong Foo*, *Martin Linen*, *Smith*, and *Evans*, the Majority contends that "any lack of 'power' under the applicable procedural rules was irrelevant to the Court's analysis," and dismisses any "distinction between 'evidentiary' defects and defects in 'power'" as "illusory." Maj. Op. 21 n.6. But were the trial courts' power and authority to enter those verdicts indeed irrelevant to the Supreme Court in assessing their validity, there would have been no reason for the Supreme Court to find "power" in *Fong Foo*, 369 U.S. at 142, and in *Evans*, 133 S. Ct. at 1081, "authority" in *Martin Linen*, 430 U.S. at 570, and "authoriz[ation]" in *Smith*, 543 U.S. at 469. Nor would there have been reason for the Court in *Martin Linen* to explain that the Federal Rules of Criminal Procedure authorized the district court to act as it did, producing "valid judgments of acquittal . . . entered on the express authority of, and strictly in compliance

21

with, Rule 29(c)," 430 U.S. at 570, or in *Smith* to highlight that "what matters is that, *as the Massachusetts Rules authorize*, the judge 'evaluated the [Commonwealth's] evidence and determined that it was legally insufficient to sustain a conviction," 543 U.S. at 469 (emphasis added) (quoting *Martin Linen*, 430 U.S. at 572). And in *Smith* and *Evans*, the Court went out of its way to point out that states could choose to circumscribe the power of their judges to enter verdicts only at certain points in the trial process and to allow appeals from purported "acquittals" outside those parameters—implicitly acknowledging that such ultra vires acquittals would lack any legal force and would not trigger the double jeopardy bar. *Smith*, 543 U.S. at 474; *Evans*, 133 S. Ct. at 1081.

In sum, only having determined in each case that the midtrial directed verdicts or judgments of acquittal were expressly authorized under the relevant state or federal rules did the Supreme Court deem them valid acquittals—notwithstanding other factual or legal errors that may have affected their accuracy pursuant to *Fong Foo*. But more to the point on habeas review, the Court's case law up to and including *Evans* confirms that the contrary proposition—that such ultra vires verdicts *must* be treated as valid acquittals for double jeopardy purposes—was not "clearly established" under federal law. And in the absence of such clearly established law, we should be reversing, not affirming, the District Court's grant of habeas relief in this case.

Here, there is no question that the trial judge in Petitioner's case exceeded his power under state law when he reconstituted the discharged jury and purported to enter a superseding verdict of acquittal in lieu of the jury's original and properly entered verdict of mistrial. As the Superior Court observed when it declined to give effect to those ultra

22

vires actions, Pennsylvania law for decades has expressly forbid a trial court from reconstituting a jury after discharge to amend its verdict. *McDaniels*, 886 A.2d at 686-87 (citing *Johnson*, 59 A.2d at 129 (holding that a jury cannot amend a verdict after being discharged)); *see Dzvonick*, 297 A.2d at 914 & n.4 (Pa. 1972) (holding that after a verdict has been recorded and a jury discharged, a court can "mold" a verdict "only in extremely exceptional cases . . . and even then only . . . to make the corrected verdict conform to the obvious intention of the jury, i.e., to conform to a verdict actually rendered, but informally or improperly stated in writing") (internal quotation marks omitted)).

For that reason, in an analysis that fair-minded jurists could view as entirely consistent with *Fong Foo*, *Martin Linen*, *Smith*, and *Evans*, the Superior Court concluded that "[o]nce the verdict was announced and recorded, and the jury was discharged, neither the judge nor the jury had any power to change the verdict," *McDaniels*, 886 A.2d at 689; that the trial judge's subsequent attempt to enter a superseding verdict of acquittal was a "legal nullity," *id.* at 688; and, hence, that the Commonwealth was not "appealing a verdict of acquittal," *id.* at 686, but rather was appealing the trial judge's entry of an "[i]llegal [v]erdict," *id.*—along the lines expressly contemplated in *Evans*, 133 S. Ct. at 1081. The Superior Court's decision thus hardly seems an "incorrect application," much less an "unreasonable application" of "clearly established federal law." *Richter*, 562 U.S. at 100-01 (emphasis omitted).

And if there remained any doubt about that even after *Evans*, it was dispelled by the Supreme Court's recent decision in *Dietz v. Bouldin*. In *Dietz*, the Court granted a writ of *certiorari* to resolve a Circuit split as to "whether and when a federal district court

23

has the authority to recall a jury after discharging it." 136 S. Ct. at 1891. Although the Court held that in civil cases, federal courts do have "carefully circumscribed" inherent power to recall a jury to correct a verdict, which they ought not exercise if there is "[a]ny suggestion of prejudice" as a result of taint or external influences on the jury, *id.* at 1893-94, the Court explained that if a federal rule or statute had prohibited district courts from recalling juries and setting aside a validly recorded jury verdict, federal judges would *not* have the "power" to take those steps—at least in the civil context, *id.* at 1892-93. As for the criminal context, the Court expressly observed it was not deciding "whether it would be appropriate to recall a jury after discharge in a criminal case," *id.* at 1895, citing specifically to *Smith*'s discussion of the double jeopardy bar *and* the ability of states to "protect themselves" by crafting procedural rules that define when a trial judge has power to enter a verdict or judgment of acquittal in the course of the proceeding, *Smith*, 543 U.S. at 473-74. *Dietz* left for another day when and whether a federal court has power to reconstitute a jury and to enter a corrected verdict that will be deemed operative in a criminal case; *a fortiori*, when and whether a state court *must* treat as operative in a criminal case a corrected verdict that the trial judge had no power under state law to enter was, before *Dietz*, and remains even today anything but "clearly established."

Yet the Majority asserts that *Dietz* is not controlling because "[w]e are not addressing whether the state court erred in concluding that the jury could not be recalled after it was discharged. Rather, given the impropriety under state law of entering the jury's not guilty verdict on the record, we are determining whether that erroneous acquittal barred retrial under the Double Jeopardy Clause." Maj. Op. at 20 n.5. In my

24

view, this unduly cabins the Court's holding in *Dietz*: The Court was not deciding in the abstract whether federal judges have the power under federal law to recall a discharged jury and to set aside its previously entered verdict with a "corrected verdict"; it was deciding that question as a predicate for determining whether the purported "corrected" verdict entered in that case was a legal nullity so that the original verdict would stand or whether, instead, the corrected verdict would be deemed the operative verdict. *Dietz*, 136 S. Ct. at 1896.

That was precisely the question before the Superior Court in this case and, after considering the very factors the Supreme Court later indicated in *Dietz* were appropriate to determine whether the superseding verdict of a recalled jury should be given effect— including whether the trial court was acting "contrary to any express grant of or limitation on the [trial] court's power," *id.* at 1892, and whether such power should be circumscribed in any event due to concerns of "external influences that can taint a juror," *id.* at 1893—the Superior Court concluded the purported superseding verdict of acquittal had no legal effect, *McDaniels*, 886 A.2d at 686-88. Specifically, it reasoned that, under controlling state law, a judge's "later reassembling [of] those who had constituted the jury" to enter an amended verdict after the jury's verdict was properly recorded and the jury discharged, was a "nullity." *Id.* at 687 (citing *Johnson*, 59 A.2d at 131). And it also opined that although the trial judge and Petitioner asserted that the jurors had not been exposed to outside influences between the time they were discharged and reassembled, "we have no record evidence of this" and "it appears that some person, whether the trial judge or defense counsel, questioned the jurors about their verdict after seeing their

25

recorded votes on the marker board"—a "discussion" the Superior Court reasonably considered to be "an outside influence." *Id.* at 688.

The Superior Court anticipated the reasoning of the Supreme Court itself in *Dietz* by identifying the question of whether the trial judge had the power to recall the jury in Petitioner's case as dispositive of the question whether the superseding verdict the trial judge purported to enter was legally cognizable. Given the distinction the Supreme Court appears to have drawn in cases before *Dietz* between legal errors going to the accuracy of an acquittal and ultra vires action going to the validity of an acquittal, its holding in *Dietz* that the validity of a corrected civil verdict turned on the "power" of the trial court to recall the discharged jury, *Dietz*, 136 S. Ct. at 1893, and its express reservation for another day of the application of this rule in criminal cases, we simply cannot say the Superior Court's decision was "an unreasonable application of clearly established [f]ederal law." *Richter*, 562 U.S. at 786.

For these reasons, I believe we are overstepping AEDPA's carefully circumscribed review by affirming the grant of habeas relief in this case. We cannot recharacterize the novel and complex question here as a simplistic one of whether a defendant can be retried following acquittal or whether a generic "erroneous" verdict of acquittal is nonetheless operative. Rather, the relevant question is whether a state trial judge's actions in recalling a discharged jury and purporting to supplant a final and properly recorded jury verdict of mistrial with a superseding verdict of acquittal—at a point in the proceeding when such actions were expressly disallowed by controlling state law—must nonetheless be deemed a valid acquittal, barring retrial under the Double

26

Jeopardy Clause. And the Supreme Court's carefully crafted decisions in *Fong Foo*, *Martin Linen*, *Smith*, *Evans*, and now *Dietz* reflect that the answer to that question was not "clearly established" at the relevant time. I do not begrudge the Majority that these cases are susceptible to other reasonable interpretations on which fairminded jurists can disagree. But on habeas review, relief must be denied unless "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with the [Supreme] Court's precedents." *Richter*, 562 U.S. at 102. That threshold is not met here, and for that reason if we reached Petitioner's claim, I would reverse.

C.

My dissent as to the Majority's analysis and disposition on the merits is prompted not only by the deferential standard of review imposed by AEDPA and the federalism and comity concerns that underlie it, but also by the broad implications of the Majority's reasoning for state laws currently in effect and for the practice of criminal law generally.

Just as many states have prescribed when midtrial acquittals may be entered by their state courts, *see Evans*, 133 S. Ct. at 1081; *Smith*, 543 U.S. at 474, many states in addition to Pennsylvania have prescribed when a court may reconstitute a jury after discharge to correct or amend a verdict. In some states it is forbidden,[6] and in some it depends on whether the court lost control over the jurors such that they had the

---

[6] *See, e.g.*, *T.D.M. v. State (Ex Parte T.D.M.)*, 117 So.3d 933, 941 (Ala. 2011) (per curiam), *Spears v. Mills*, 69 S.W.3d 407, 413 (Ark. 2002); *West v. State*, 92 N.E.2d 852, 855 (Ind. 1950); *State v. Hurd*, 8 A.3d 651, 662 (Me. 2010); *Sargent v. State*, 11 Ohio 472, 474 (1842) (en banc); *Ware v. Graham*, 417 P.2d 936, 939 (Okla. Crim. App. 1966); *Yonker v. Grimm*, 133 S.E. 695, 697-98 (W. Va. 1926).

27

opportunity to be exposed, or were actually exposed, to an outside influence.[7]  Moreover,

at least two state supreme courts have held that double jeopardy does not bar retrial in

circumstances similar to those here.[8]  States institute these rules for good reason. "Freed

from the crucible of the jury's group decisionmaking enterprise, discharged jurors may

begin to forget key facts, arguments, or instructions." *Dietz*, 136 S. Ct. at 1894.

Moreover, "they are more likely to be exposed to potentially prejudicial sources of

information or discuss the case with others," *id.*, including the attorneys and judge in the

case—and such exposure may happen immediately.

---

[7] *See, e.g.*, *People v. Hendricks*, 737 P.2d 1350, 1358-59 (Cal. 1987) (en banc); *Montanez v. People*, 966 P.2d 1035, 1036-37 (Colo. 1998) (en banc); *State v. Colon*, 864 A.2d 666, 775 (Conn. 2004); *Lahaina Fashions, Inc. v. Bank of Hawai'i*, 319 P.3d 356, 368 (Haw. 2014); *State v. Fornea*, 140 So.2d 381, 383 (La. 1962); *Commonwealth v. Brown*, 323 N.E.2d 902, 905 (Mass. 1975); *Anderson v. State*, 95 So.2d 465, 467-68 (Miss. 1957); *Pumphrey v. Empire Lath & Plaster*, 135 P.3d 797, 804 (Mont. 2006); *Sierra Foods v. Williams*, 816 P.2d 466, 467 (Nev. 1991) (per curiam); *Sierra Foods v. Williams*, 816 P.2d 466, 467 (Nev. 1991) (per curiam); *State v. Rodriguez*, 134 P.3d 737, 741 (N.M. 2006); *Newport Fisherman's Supply Co. v. Derecktor*, 569 A.2d 1051, 1053 (R.I. 1990); *State v. Myers*, 459 S.E.2d 304, 305 (S.C. 1995); *Webber v. State*, 652 S.W.2d 781, 782 (Tex. Crim. App. 1983) (en banc); *Melton v. Commonwealth*, 111 S.E. 291, 294 (Va. 1922).

[8] *See People v. Carbajal*, 298 P.3d 835, 840 (Cal. 2013) (holding that double jeopardy did not bar retrial where the court entered a not guilty verdict on a charge for which it "had no authority to consider" and for which "no valid verdict could have been rendered"); *State v. Davenport*, 147 So. 3d 137, 150 (La. 2014) (holding that a judgment of acquittal erroneously entered in the midst of a jury trial under a statute applicable only in bench trials did not bar retrial; *but cf. Davenport v. Richardson*, No.14-cv-1092, 2016 WL 285060 (W.D. La. Jan. 20, 2016) (applying de novo review to a § 2241 petition and granting habeas relief on the ground that, although the trial judge had entered the acquittal in that case based on the wrong statute, there was no state authority prohibiting the trial judge from entering a midtrial acquittal and the trial judge in fact "had the authority to order an acquittal based on the original jurisdiction granted to him by the Louisiana Constitution").

As the Pennsylvania Supreme Court put it in *Johnson*, the case on which the

Superior Court in this case expressly relied:

> [A] consideration of the evil consequences [that] would
> follow permitting a jury to reassemble and alter its verdict on
> the ground of mistake, should in itself deter courts from
> sanctioning such practice. If this practice were judicially
> sanctioned, a jury might acquit a defendant of a crime and
> then a day, a week or a month later reassemble and declare
> that the verdict was a mistake, that they intended to find the
> defendant guilty and would then proceed to do so. To permit
> such a disorderly practice in the administration of justice is
> unthinkable. It is the antithesis of due process of law.

*Johnson*, 59 A.2d at 131.

The Majority's approach does not accord with these concerns. Instead, it

encourages state courts to re-empanel discharged juries where subsequent debriefing

ostensibly reveals that, for example, one or more jurors misunderstood the jury

instructions and would have acquitted. The longstanding rule that jurors are presumed to

follow their instructions as given, which rarely permits second-guessing the jury's

performance after the fact, was intended to safeguard the propriety and finality of verdicts

and to avoid this very result. *See, e.g.*, *Richardson v. Marsh*, 481 U.S. 200, 211 (1987);

*Commonwealth v. Baker*, 614 A.2d 663, 672 (Pa. 1992); *see also* Fed. R. Evid. 606(b)(1)

("During an inquiry into the validity of a verdict . . . , a juror may not testify about any

statement made or incident that occurred during the jury's deliberations . . . or any juror's

mental processes concerning the verdict or indictment."); Pa. R. Evid. 606(b) (same);

*Karl v. Burlington N. R.R. Co.*, 880 F.2d 68, 74 (8th Cir. 1989) (stating that Federal Rule

29

of Evidence 606 allows juror testimony about a "clerical error" in recording the verdict but not about "the jury's understanding of the court's instructions").

What's more, if a jury not only can, but as a matter of double jeopardy law must, be re-empaneled after it renders its verdict (or declares that it cannot reach one) whenever the jurors allegedly misunderstood the jury instructions and later assert that, with a better understanding of those instructions, they would have voted to acquit, the work of the defendant's trial counsel must carry on well beyond the jury's discharge. For if the Majority's rationale is correct, trial counsel who forego the opportunity post-trial to explore any misunderstanding the jurors may have had concerning the jury instructions or any possibility that the verdict, although accurately reflecting what the jurors reported in open court, did not reflect their true intentions, do so at their peril—inviting habeas claims based not only on the ground that the jury's properly recorded verdict was incorrect and should have been "amended," but also that trial counsel was ineffective for failing to investigate this possibility.

### III.

Notwithstanding the above-referenced reasons to reverse on the merits, I also dissent because we should not be reaching those merits. As Petitioner's counsel candidly conceded at oral argument, Petitioner's double jeopardy claim "wasn't specifically presented, it's clear." Oral Arg. 30:00-30:08. And for that reason, Petitioner did not even attempt in her briefing before this Court to argue that the claim had been raised, instead seeking to excuse her admitted procedural default on two specific grounds. Yet,

over Petitioner's own denial, the Majority contends that Petitioner did fairly present her claim to the state court. I respectfully disagree.

To "fairly present[]" a claim to the state courts, a habeas petitioner "must present a federal claim's factual and legal substance to the state courts in a manner that puts them on notice that a federal claim is being asserted." *Robinson v. Beard*, 762 F.3d 316, 328 (3d Cir. 2014) (alteration in original). A petitioner does not satisfy the fair presentation requirement merely by "present[ing] all the facts" to a state court, *Picard v. Connor*, 404 U.S. 270, 277 (1971); *see Gray v. Netherland*, 518 U.S. 152, 163 (1996), even when those facts evince a "clear violation[]" of the petitioner's constitutional rights, *Duckworth v. Serrano*, 454 U.S. 1, 4 (1981) (per curiam). The Supreme Court has admonished that we must "adhere[] to this federal policy, for 'it would be unseemly in our dual system of government for a federal district court to upset a state court conviction without an opportunity to the state courts to correct a constitutional violation,'" *Picard*, 404 U.S. at 275 (quoting *Darr v. Burford*, 339 U.S. 200, 204 (1950)), and further, that "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a prisoner made insufficient effort to pursue in state court proceedings," *Brown v. Wenerowicz*, 663 F.3d 619, 629 (3d Cir. 2011) (quoting *Cullen v. Pinholster*, 563 U.S. 170, 186 (2011)). We are called upon to safeguard this principle "[a]s a matter of comity and federalism," *Lark v. Sec'y Pa. Dep't of Corr.*, 645 F.3d 596, 611 (3d Cir. 2011), and "[o]ut of respect for the finality of state-court judgments," *House v. Bell*, 547 U.S. 518, 522 (2006).

31

The record in this case demonstrates Petitioner's double jeopardy claim was not fairly presented to the state courts and therefore, absent some basis to overcome her default, is procedurally barred. On direct appeal to the Superior Court, the Commonwealth argued that the trial court had no authority to re-empanel the jury and enter the acquittal, and because that verdict was a legal nullity, the trial court's original declaration of a mistrial must stand. And the only arguments raised by Petitioner in response were that the second verdict was not tainted so that the trial court properly exercised its "discretionary power to insure the fairness of the proceedings" in the "interest of justice," App. 511 (quoting *Commonwealth v. Powell*, 590 A.2d 1240, 1243 (Pa. 1991)), and that the Superior Court lacked jurisdiction over the appeal because it was not a final or collateral order under the Pennsylvania Rules of Appellate Procedure. Petitioner did not so much as mention the trial court's passing reference to double jeopardy in its decision denying the Commonwealth's Motion to Set Aside Illegal Verdict, and the Superior Court did not address double jeopardy concerns in its decision, instead reversing the trial court and remanding for retrial on the ground that the trial court, under *Johnson*, 59 A.2d at 131, "had no authority to dismiss the deadlocked verdict on third degree murder once it was recorded and the jury dismissed," *McDaniels*, 886 A.2d at 686-87.

Similarly, when Petitioner appealed her conviction of third degree murder following retrial, she raised only state law evidentiary and trial error claims. And while she listed "[d]ouble [j]eopardy clause" among the four claims she intended to pursue in her subsequent pro se PCRA petition, Petitioner failed to complete her appeal to the

32

Superior Court after that petition was denied. Given this procedural history, the state courts here did not have "a fair opportunity to consider the [double jeopardy] claim and to correct that asserted constitutional defect in [Petitioner's] conviction," *Picard*, 404 U.S. at 276, and it was for good reason that Petitioner opted on federal habeas to concede that her double jeopardy claim had not been fairly presented and instead to dedicate her efforts to overcoming the procedural bar.

Neither of the two grounds on which the Majority relies support its conclusion that Petitioner's claim was fairly presented. First, the Majority maintains it was sufficient for Petitioner, in the context of opposing the Commonwealth's appeal to the Superior Court, to note that the "Commonwealth is seeking to overturn the verdict of not guilty on murder of the third degree and has asked this Honorable Court to review the same." Maj. Op. at 11 (emphasis omitted) (quoting App. 505). But that remark in the fact section of Petitioner's brief was simply recharacterizing the "[i]llegal [v]erdict" the Government sought to set aside and does not come close to fairly raising for the Superior Court the question whether a verdict that is ultra vires and a "legal nullity" under state law must be recognized as a valid verdict as a matter of federal double jeopardy law, or, more precisely, whether an error in the very power of the court to enter that verdict equates with the evidentiary and merits-based errors that the Supreme Court held did not vitiate the verdicts in *Ball*, *Fong Foo*, and their progeny. Instead, this excerpt is nothing more than an accurate statement of the procedural posture of the case—a statement of fact devoid of any legal substance and insufficient to constitute exhaustion, *Picard*, 404 U.S.

33

at 277, particularly where, as here, the facts do not evince a "clear violation" of constitutional rights, *Serrano*, 454 U.S. at 4.

Second, the Majority suggests that when the Superior Court mentioned at the outset of its opinion that this case did not raise any concern that the Commonwealth was "appealing a verdict of acquittal, which [would be] clearly impermissible," *McDaniels*, 886 A.2d at 686, it was acknowledging that this case did raise that concern and that Petitioner had presented that concern in the form of a federal double jeopardy claim based on *Fong Foo*'s "erroneous acquittal" doctrine, Maj. Op. at 12. I find that logic perplexing. By remarking that it might appear "at first glance" that the Commonwealth was appealing an acquittal and then explaining that the Commonwealth was actually appealing an ultra vires verdict that had no legal force under Pennsylvania Supreme Court precedent, the Superior Court made clear that it believed itself presented with only a question of state law and that its resolution of that state law question obviated any need to consider whether the Commonwealth was "appealing a verdict of acquittal." *McDaniels*, 886 A.2d at 686. To turn that statement on its head and contend, as the Majority does, that it demonstrates the state court had fair notice of, considered, and actually decided the complex double jeopardy question Petitioner now seeks to raise, steps far outside of our role and gives short shrift to the fundamental principles of federalism and comity that undergird the exhaustion requirement. *See Lawrence v. Florida*, 549 U.S. 327, 341 (2007).

Because it espouses an exhaustion argument that was not raised by Petitioner, the Majority does not reach the two arguments Petitioner did raise, namely that (1) it would

34

be sufficient for the Superior Court to rule on the merits of her double jeopardy claim *sua sponte* and that it had in fact done so,[9] and (2) there was cause and prejudice for her failure to exhaust her claim because her attorneys did not raise the argument in state court.  The first lacks merit because the Superior Court never proceeded beyond its conclusion under state law that there was no legally cognizable acquittal.  And as to the second, while ineffective assistance of counsel can be "cause" excusing a petitioner's failure to exhaust her claims, Petitioner did not argue to the District Court that her state trial or appellate counsel were ineffective for failing to pursue a double jeopardy argument, *see, e.g.*, *Trevino v. Thaler*, 133 S. Ct. 1911, 1917 (2013), or that her PCRA counsel was ineffective for failing to pursue an ineffective-assistance-of-trial-counsel claim resting on the omitted double jeopardy argument, *see Martinez v. Ryan*, 132 S. Ct. 1309, 1315 (2012).  Any such arguments are hence waived.  *See, e.g.*, *Lomando v. United States*, 667 F.3d 363, 381 n.19 (3d Cir. 2011).

_____

[9] The Majority observes that even if it had determined that Petitioner did not raise a double jeopardy claim, it likely would have concluded that the Superior Court's *sua sponte* consideration of the issue would satisfy the exhaustion requirement.  *See* Maj. Op. at 13 n.4.  Although a state court's *sua sponte* consideration of an argument not actually raised by a petitioner may well satisfy the interests of comity and federalism underlying the procedural default bar and thus may be sufficient to constitute exhaustion, the Supreme Court has not yet adopted this rule.  While it said in *Castille v. Peoples*, that "[i]t is reasonable to infer an exception [to the exhaustion requirement] where the State has actually passed upon the claim," the claim in that case was presented belatedly to the state courts.  489 U.S. 346, 351 (1989).  To date, our Circuit has not adopted this rule either, *see Sharrieff v. Cathel*, 574 F.3d 225, 228 n.4 (3d Cir. 2009) (noting in dictum that the Supreme Court raised the possibility in *Castille* of this exception to the exhaustion requirement), although some Circuits have, *see, e.g.*, *Jones v. Dretke*, 375 F.3d 352, 355 (5th Cir. 2004); *Sandgathe v. Maass*, 314 F.3d 371, 376-77 (9th Cir. 2002); *Walton v. Caspari*, 916 F.2d 1352, 1356 (8th Cir. 1990); *Sandstrom v. Butterworth*, 738 F.2d 1200, 1206 (11th Cir. 1984).  The exception, in any event, is inapplicable here as the Superior Court did not address any double jeopardy claim *sua sponte*.

In short, Petitioner failed to fairly present her double jeopardy claim to the state courts, waived on federal habeas any argument that she did, and states no ground to overcome her default. Accordingly, she was procedurally barred from pursuing her double jeopardy claim on federal habeas and neither the District Court nor this Court should have reached the merits of that claim.

IV.

As a federal court reviewing a state court conviction, we are obligated to comport with the principles of federalism, comity, and finality that undergird the procedural default bar and the exceedingly high degree of deference mandated by AEDPA. And in cases where the Supreme Court has perceived Courts of Appeals to disregard this mandate and to substitute their own judgment for that of state courts, it has not hesitated to summarily reverse with harsh admonitions that the appellate court "misunderstood the role of a federal court in a habeas case," *Davis v. Ayala*, 135 S. Ct. 2187, 2202 (2015), and "all but ignored the only question that matters under § 2254(d)(1)," that is, "whether it is possible fairminded jurists could disagree that [the state court's] arguments or theories are inconsistent with the holding in a prior decision of" the Supreme Court, *Richter*, 562 U.S. at 102 (internal quotations and citations omitted).

Heeding those admonitions, I would reverse the District Court's grant of habeas relief in this case.

36